# EXHIBIT 2

# SUPPLY OF GOODS AND SERVICES AGREEMENT

This Agreement is dated 1/24/2025

**BETWEEN**

(1) **LIV GOLF INCORPORATED**, a company incorporated in Delaware, with a mailing address at 222 Lakeview Avenue, West Palm Beach, Florida 33401 ("**LIV US**");

(2) **LIV GOLF LTD**, a company incorporated in England with company number 13473438 and with a registered office at C/O Zedra, Booths Hall Booths Park 3, Chelford Road, Knutsford, England, WA16 8GS ("**LIV UK**"); and

(3) **MOBII SYSTEMS GROUP LIMITED**, a company incorporated in Canada with a mailing address at Unit 309, 57 Mill Street North, Brampton, Ontario, L6X 1S9, Canada ("**Supplier**" or "**Mobii**").

## PART 1 - KEY TERMS

| | |
|---|---|
| **Commencement Date** | 1 January 2025. |
| **Term** | From the Commencement Date until 31 December 2026, unless terminated earlier in accordance with the provisions of this Agreement. |
| **Events** | All League Tournaments forming part of the LIV Golf League and the 'LIV Golf Promotions' tournament in the 2025 and 2026 Seasons respectively. |
| **Products** | The Supplier shall provide each of the Products (each a "**Product**"), as further described in Annex E of this Agreement and at Clause 5 of Part 4 below. |
| **Purchase Amount** | The LIV Golf Parties shall purchase Products in accordance with this Agreement at a combined Product Price of $299,984.00 inclusive of applicable taxes.<br><br>The detailed Product Prices shall be the prices set out in Annex F. |
| **Delivery** | As described at Annex E of this Agreement and as defined at Clause 8 of Part 4 below. |
| **Delivery Costs** | Included in Purchase Amount, subject to paragraph 4.1.2 of Annex E. |

| | |
|---|---|
| **Products Payment Schedule** | Purchase Amount to be paid by a LIV Golf Party(ies) within 7 days of execution of this Agreement, subject to the LIV Golf Parties having received a valid invoice for the Purchase Amount by the date of execution of this Agreement. |
| **Services** | Supplier shall provide the services as listed in Part 3 with respect to both the 2025 and 2026 Seasons. |
| **Services Fees** | Means the Fixed Fees and Variable Fees.<br><br>The total Services Fees for the Term are:<br>- $2,937,800.00 of Fixed Fees*; plus<br>- any Variable Fees.<br><br>The aggregate Services Fees for the 2025 Season are:<br>- $1,582,400.00 of Fixed Fees*; plus<br>- any Variable Fees.<br><br>The aggregate Services Fees for the 2026 Season are:<br>- $1,355,400.00 of Fixed Fees*; plus<br>- any Variable Fees.<br><br>All pricing for the Services are outlined in Annexes B and C, are quoted in USD and exclude all taxes and duties. Supplier warrants that no tax or duties will become payable unless the Services are provided in relation to Events in Canada.<br><br>* The above figures are conditional upon a LIV Golf Party requesting the commencement of the ShotVu Application Licence. See Clause 5.4 of Part 3 for detail regarding price adjustments regarding the Fees for the ShotVu Application Licence and related Support Services. |
| **Services Payment Schedule** | The following Services Fees for the 2025 Season shall become due within 7 Business Days of the Commencement Date:<br><br>(i) the Licence Fees relating to the 2025 Season, as detailed at rows 1, 2, 4, 5, and 9 of Annex B; and<br>(ii) the Fees in relation to the Support Services as detailed at rows 16(a) to 16(m) (but excluding rows 16(c), 16(f), 16(i), 16(k), 16(l) and 16(m)) of Part 1 of Annex B.<br><br>The following Services Fees for the 2025 Season shall become due within 7 Business Days of the Acceptance Date:<br><br>(iii) the Build Fees relating to the 2025 Season, as detailed at rows 7, 10, 12, and 14 of Annex B;<br>(iv) the Licence Fees relating to the 2025 Season, as detailed at rows 8, 11, and 15 of Annex B; and<br>(v) the Fees in relation to the Support Services as detailed at rows 16(i), 16(k) and 16(m) of Annex B.<br><br>The following Services Fees for the 2026 Season shall become due within 7 Business Days of the Anniversary Date: |

| | |
|---|---|
| | (vi) the Licence Fees relating to the 2026 Season, as detailed at rows 1, 2, 4, 5, and 9 of Annex B; and<br>(vii) the Fees in relation to the Support Services as detailed at rows 16(a) to 16(m) (but excluding rows 16(c), 16(f), 16(i), 16(k), 16(l) and 16(m)) of Part 1 of Annex B.<br><br>The following Services Fees for the 2026 Season shall become due 7 Business Days of the date one (1) year from the date of the relevant Acceptance Date:<br><br>(viii) the Licence Fees relating to the 2026 Season, as detailed at rows 8, 11, 13, and 15 of Annex B; and<br>(ix) the Fees in relation to the Support Services as detailed at rows 16(i), 16(k), 16(l) and 16(m) of Annex B.<br><br>The Fees for the 'ShotVu Application Licence' and Support Services for the ShotVu Application shall be payable on the dates and in the amounts as set out at rows 6 and 16(f) of Annex B.<br><br>Payment of invoices in relation to the above matters and where there is no bona fide dispute shall be made in full by the respective due date set out above, subject to the LIV Golf Parties having received a valid invoice not less than 7 days prior to the applicable payment date and where an invoice is not received by such date the time for payment shall be extended to 7 days after receipt of the invoice.<br><br>All Variable Fees payable by LIV Golf Parties under this Agreement shall be invoiced monthly in arrears. |
| **Minimum Hospitality Spend** | The Supplier shall, during the Term, purchase from the LIV Golf Parties hospitality benefits and tickets (the "**Hospitality Benefits**") equal to a value of no less than $119,448 for use in relation to the Events only (the "**Minimum Hospitality Spend**").<br><br>In the event that the Supplier purchases less than the Minimum Hospitality Spend with respect to the Hospitality Benefits during the Term, the LIV Golf Parties may charge the Supplier for any shortfall between:<br><br>(a) the Minimum Hospitality Spend in the relevant period; and<br>(b) the value of the Hospitality Benefits actually purchased by the Supplier during that period.<br><br>The Supplier's use of such purchased Hospitality Benefits shall be subject to the LIV Golf Parties' standard terms and conditions of use in relation to such tickets and benefits. |

The Parties hereby agree to the terms of this Agreement, which is made up of:

(i) this Part 1 (Key Terms);
(ii) Part 2 (Definitions and Interpretation);
(iii) Part 3 (Services);

(iv) Part 4 (Terms and Conditions);
(v) Part 5 (TUPE Provisions);
(vi) Annex A (Proforma Certificate of Liability Insurance);
(vii) Annex B (Total Services Fee Breakdown);
(viii) Annex C (Streaming Services Fee Breakdown);
(ix) Annex D (Service Levels and Service Credits);
(x) Annex E (Products and Delivery);
(xi) Annex F (Product Prices);
(xii) Annex G (C-to-P Transfer Clauses); and
(xiii) Annex H (UK International Data Transfer Addendum).

The rules of interpretation and definitions set out in Part 2 (Definitions and Interpretation) shall apply to all Parts of this Agreement.

SIGNED for and on behalf of
**LIV GOLF INCORPORATED**

Signed by:
81E282E99B824A5...

by an authorised signatory
1/23/2025

SIGNED for and on behalf of
**LIV GOLF LTD**

DocuSigned by:
Louise Savage
0FC96367430240C...

by an authorised signatory
21 January 2025

SIGNED for and on behalf of
**MOBII SYSTEMS GROUP LIMITED**

DocuSigned by:
6B400CE2DD0C4B2...

by an authorised signatory

## PART 2
## DEFINITIONS AND INTERPRETATION

### 1. INTERPRETATION

1.1. In this Agreement (unless the context otherwise requires):

1.1.1. "LIV Golf Parties" means LIV US, LIV UK collectively, and "LIV Golf Party" means either of them and their personal representatives, successors and permitted assigns;

1.1.2. "Parties" means LIV US, LIV UK and the Supplier collectively, and Party means either of them and their personal representatives, successors and permitted assigns;

1.1.3. a person includes a natural person, corporate or unincorporated body (whether or not having separate legal personality);

1.1.4. a reference to a company shall include a company, corporation or other body corporate, wherever and however incorporated or established;

1.1.5. a reference to a statute or statutory provision is a reference to it as amended, extended or re-enacted from time to time, and shall include all subordinate legislation made from time to time under that statute or statutory provision;

1.1.6. a reference to writing or written includes email but not WhatsApp, text messages, any other form of instant messaging or fax;

1.1.7. any obligation on a Party not to do something includes an obligation not to allow that thing to be done;

1.1.8. any words following the terms including, include, in particular, for example or any similar expression shall be construed as illustrative and shall not limit the sense of the words, description, definition, phrase or term preceding those terms;

1.1.9. reference to any agreement, contract, document or deed shall be construed as a reference to it as varied, supplemented or novated;

1.1.10. words importing the singular shall include the plural and vice versa;

1.1.11. the headings, index and cover page are all for reference only and shall be ignored when construing this Agreement;

1.1.12. references to "£" in this Agreement are references to British pounds sterling;

1.1.13. references to "$" in this Agreement are references to US Dollars;

1.1.14. references to Clauses, Paragraphs and Parts in this Agreement are, unless otherwise provided, references to the Clause, Paragraph and Part of or to, this Agreement;

1.1.15. a reference to a Clause is, unless otherwise stated, a reference to a Clause in the same Part of this Agreement;

1.1.16. subject to Clause 1.2.4 of Part 3, any reference to ViewLift shall be understood as meaning any B2C video provider;

1.1.17. subject to Clause 1.2.4 of Part 3, any reference to SimpleBet shall be understood as meaning any B2B betting feed provider or any B2B provider of feeds to businesses similar to betting operators (including sweepstakes and daily fantasy sports business);

1.1.18. whenever the terms of this Agreement provide for a right for a LIV Golf Party to specify a matter or for the choice, consent or approval of such LIV Golf Party to be made, given or obtained (or any equivalent term), unless otherwise stated, such LIV Golf Party shall have an absolute and unfettered discretion to specify such matter or make, grant or withhold such choice, consent or approval and such must be in given in writing; and

1.1.19. if there is any conflict, ambiguity or inconsistency between the following Parts of this Agreement ((i) Part 1; (ii) Part 3; and (iii) Part 4, the items shall take priority in the order of the preceding list (i.e. (i) – (iii)) to the extent of such conflict, ambiguity or inconsistency.

1.2. This Agreement shall be binding on, and endure to the benefit of, the Parties to this Agreement and their respective personal representatives, successors and permitted assigns.

**2. DEFINITIONS**

2.1. The following definitions apply in this Agreement:

| | |
|---|---|
| **2024 Services Agreement:** | means the services agreement between the Parties dated 25 January 2024 in respect of the provision of services similar to the Services by the Supplier to the LIV Golf Parties, as amended by agreement dated 12th August 2024; |
| **2024 Supply of Goods Agreement:** | means the supply of goods agreement between LIV US and the Supplier dated 4th December 2023 in respect of the provision of encoders by the Supplier; |
| **Acceptance Date:** | shall have the meaning given to it at Clause 12.3 of Part 3; |
| **Adequacy Decision:** | means, as applicable,<br>(a) a positive finding of adequacy covering a transfer of personal data from a UK entity and/or an entity in the EEA to a non-UK or non-EEA entity by the European Commission in relation to the data protection regime of a certain non-EEA country or territory pursuant to Article 45 of the GDPR; or<br>(b) adequacy regulations covering a transfer of personal data from a UK entity and/or an entity in the EEA to a non-UK or non-EEA entity pursuant to sub-paragraph 4(1), Part 3, Schedule 21 of the Data Protection Act 2018 (as amended) (including under any regulations issued by the UK Secretary of State pursuant to sub-paragraph 4(3), Part 3, Schedule 21 of that Act), in relation to the data protection regime of a certain non-UK country or territory,<br>in each case, where those regulations have not been repealed or invalidated by a body having competent jurisdiction and authority, or any successor framework or regulation thereto; |
| **Affiliate:** | means, with respect to a Party hereto, any person or entity that Controls such Party, is Controlled by such Party or is under common Control with such Party; |
| **Agreement:** | means this supply of goods and services agreement between the LIV Golf Parties and the Supplier; |
| **AI:** | means artificial intelligence; |

| | |
|---|---|
| **AI Caddie:** | a comprehensive digital assistant designed to revolutionize the fan experience in relation to the League by providing comprehensive, real-time assistance across key interaction areas; |
| **Anniversary Date:** | means the date one year after the Commencement Date; |
| **Applicable Laws:** | means any and all laws, statutes, regulations, decisions, rulings, government policies, enactments or instructions (including federal, state, national, regional, local or municipal laws, regulations or by-laws of any kind whatsoever) which may from time to time be in force and relevant to the rights and obligations under this Agreement or either of the LIV Golf Parties or any LIV Golf Affiliate's business activities; |
| **Black Box:** | means the "black box" in the deployment of a platform within a cloud environment and refers to the Supplier platform and services whose internal details and operations are intentionally abstracted or concealed from the LIV Golf Parties' Users and administrators.<br><br>Users will interact with the black box through the well-defined Supplier interfaces and APIs, but they do not have visibility or control over the underlying infrastructure, software, or configurations. This abstraction simplifies the user experience, promotes ease of use, and allows for efficient management of the platform without requiring in-depth knowledge of its inner workings. The black box is employed to provide a higher level of abstraction and automation, enabling Users to focus on their applications and workloads while Supplier handles the complexities of infrastructure management; |
| **Build Fees:** | means those Fees that relate to the build, integration and customisation of a part of the Services, as detailed in rows 7, 10, 12 and 14 of Annex B to this Agreement; |
| **Business Day:** | means a day other than a Saturday, Sunday or public holiday in England when banks in England are generally open for business; |
| **Business Hours:** | means the Supplier's hours of business, being 9am to 5pm Eastern Time; |
| **CDN:** | has the meaning given in Clause 2.2.2 of Part 3; |
| **Champion Data:** | means Champion Data Holdings Pty Ltd, a company which designs, builds and integrates data platforms and provides data analytics services or other company within the business known as 'Champion Data' and that provides services to a LIV Golf Party; |
| **Clip Replay Generator:** | has the meaning given to it in Clause 8.1 of Part 3; |

| | |
|---|---|
| **Clip Replay Generator Module Licence:** | has the meaning given in Clause 8.3 of Part 3; |
| **Commencement Date:** | has the meaning given to it in the "Commencement Date" section in Part 1; |
| **Control:** | has the meaning given to it in section 1124 of the English Corporation Tax Act 2010. "Controlling" and "Controlled" have meanings correlative thereto; |
| **C-to-P Transfer Clauses:** | means the EU Standard Contractual Clauses for Controller-to-Processor transfers as set out in the Annex of Commission Implementing Decision (EU) 2021/914 of 4 June 2021 and reproduced in Annex G to this Agreement; |
| **Data Engine:** | has the meaning given in Clause 3.1 of Part 3; |
| **Data Engine Module Licence:** | has the meaning given in Clause 3.3 of Part 3; |
| **Data Exporter:** | means a Party (or Parties) which imports personal data from a Data Exporter, in circumstances where the personal data are transferred from one country to another; |
| **Data Importer:** | means a Party which imports personal data from a Data Exporter(s), in circumstances where the personal data are transferred from one country to another; |
| **Data Protection Legislation:** | means all applicable laws, regulations and rules of any government, agency or authority which are in force from time to time and which are applicable to the processing of personal data or the privacy of individuals, including:<br>(a) to the extent the UK GDPR applies, the laws of the United Kingdom or of a part of the United Kingdom which relates to the protection of personal data; and<br>(b) to the extent the EU GDPR applies, the laws of the European Union or any member state of the European Union to which the Supplier is subject, which relates to the protection of personal data. |
| **DCM:** | means 'Dynamic Cloud Mixer', as further described at Clause 4 of Part 3; |
| **Dedicated Environment Platform Licence:** | has the meaning given in Clause 1.1 of Part 3; |
| **Deliverables:** | means any documents, products and materials to be developed and provided by the Supplier as part of or in connection with the Services, including any products of the Services; |

| | |
|---|---|
| **Delivery Date:** | the date specified for delivery of Products specified in Annex E; |
| **Delivery Location:** | the location specified for delivery of Products specified in Annex E; |
| **Delivery:** | means completion of delivery of Products as described at Annex E and in accordance with Clause 8.2 and Clause 8.5.1 of Part 4; |
| **Deltatre:** | means Deltatre S.p.A., a company which designs website and mobile application user interfaces or other company within the business known as 'Deltatre' and that provides services to a LIV Golf Party; |
| **DRM:** | has the meaning given in Clause 2.2.4 of Part 3; |
| **Dynamic Cloud Mixer Licence:** | has the meaning given in Clause 4.3 of Part 3 |
| **Edge Cluster:** | is a computing infrastructure configuration that consists of a group of interconnected servers deployed at the closest cluster to the end-users and/or video sources. The primary purpose of an edge cluster is to process and store data in proximity to where it is either generated or consumed. This localized computing environment minimizes latency and bandwidth usage, making it well-suited for applications that require real-time or low-latency processing for content delivery; |
| **EEA:** | means the European Economic Area; |
| **EU GDPR:** | means the General Data Protection Regulation ((EU) 2016/679), as it has effect in EU law; |
| **Event of Default:** | means, in respect of a Party:<br>(i) being in material breach of an obligation under this Agreement and, if the breach is capable of remedy, failing to remedy the breach within:<br>(a) seven days; or<br>(b) such shorter period of time as is reasonably expected if the breach is within 21 days of an Event or during an Event, starting on the day after receipt of notice from the other Party requiring remedy of such breach;<br>(ii) a breach of an obligation under this Agreement (whether or not it is capable of remedy) which is persistent;<br>(iii) it is dissolved or struck off the respective register of companies;<br>(iv) a resolution is passed for the winding up of the Party or a court of competent jurisdiction making an order for winding up or dissolution;<br>(v) a petition is presented or a resolution is passed for the Party to be placed in administration or notice is given by the Party, |

| | |
|---|---|
| | the directors or other officers of that Party or a qualifying charge holder to appoint an administrator in respect of that Party;<br>(vi) a receiver (which expression shall include an administrative receiver) is appointed in respect of the Party or any of its assets and is not discharged within a period of 30 days, or a mortgagee, chargee or other encumbrancer takes possession of, or otherwise enforces, its security;<br>(vii) it invokes, takes any steps to invoke or otherwise becomes subsequent to, any law, proceedings, contractual arrangements or procedures relating to any composition, rescheduling or arrangement with its creditors including but not limited to any voluntary arrangement under Part 26 of the Companies Act 2006 or Part I of the Insolvency Act 1986 in respect of the Party;<br>(viii) it is unable to pay its debts within the meaning of Section 123(2) of the Insolvency Act 1986; or<br>(ix) any event which is analogous to the events in (iii) to (viii) above anywhere in the world.<br>For the purposes of sub-Clauses (i) and (ii) of this definition, a breach shall be considered capable of remedy:<br>(a) if the Party in breach can comply with the provision in question in all respects other than as to the time of performance; and<br>(b) if time of performance is not of the essence. |
| **Event:** | has the meaning given to it in the "Events" section in Part 1; |
| **Existing Products:** | means the encoders procured by LIV Golf Parties and supplied by the Supplier under the 2024 Supply of Goods Agreement; |
| **Existing Product Support:** | has the meaning given in Clause 11.4.1 of Part 3; |
| **Fees:** | means as appropriate, the Services Fees and/or the Product Prices; |
| **Fixed Fees:** | means:<br>(a) the fees for the 2025 Season as below:<br>(i) the Build Fees relating to the 2025 Season, as detailed at rows 7, 10, 12 and 14 of Annex B;<br>(ii) the Licence Fees relating to the 2025 Season, as detailed at rows 1, 2, 4, 5, 6, 8, 9, 11 and 15 of Annex B; and<br>(b) the fees for the 2026 Season as below: |

| | |
|---|---|
| | (i) the Licence Fees relating to the 2026 Season, as detailed at rows 1, 2, 4, 5, 6, 8, 9, 11, 13 and 15 of Annex B; |
| **Force Majeure Event:** | means any event beyond a Party's reasonable control, including an act of God, storm, fire, earthquake, flood, epidemic, pandemic (whether currently known to the Parties or otherwise, including COVID-19 and variant thereof and other infectious and/or communicable diseases, viruses, bacteria or illnesses), strike, boycott of the Events or the League, civil disturbance, hooliganism, terror attack, national mourning, war, or any Applicable Law, or any law, regulation or any action taken by a government, public authority or regulator of golf; |
| **GCP:** | means a LIV Golf Party's Google Cloud Platform tenant from time to time; |
| **HLS:** | has the meaning given in Clause 2.2.9 of Part 3; |
| **Insurance Policies:** | has the meaning given in Clause 12.2 of Part 4; |
| **Intellectual Property:** | means all inventions, patents, utility models, designs (including rights relating to semi-conductor topographies), database rights, copyright and related rights, rights in get up and trade marks (in each case whether registered or unregistered), together with all rights to the grant of and applications for the same and including all similar or analogous rights and all other rights in the nature of intellectual and industrial property throughout the world and all future rights of such nature; |
| **International Transfer:** | means any of the following transfers of personal data between the Parties and any sub-processor:<br>(a) any transfer of personal data taking place from a UK entity and/or an EEA entity to a non-UK and/or non-EEA Entity; and<br>(b) any transfer of personal data taking place from a non-UK entity and/or non-EEA entity to a UK entity and/or an EEA entity; |
| **KAM:** | has the meaning given in Clause 11.2.1 of Part 3; |
| **KlipVu:** | has the meaning given in Clause 9.1 of Part 3; |
| **KlipVu Application Licence:** | has the meaning given in Clause 9.3 of Part 3; |
| **Kode Application:** | has the meaning given in Clause 10.1 of Part 3; |
| **Kode Licence:** | has the meaning given in Clause 10.3 of Part 3; |

| | |
|---|---|
| **League Tournament:** | means a tournament which is part of the League.<br>For the avoidance of doubt, a League Tournament shall not include any tournaments on the “International Series” or any women’s events; |
| **League:** | means a newly-formed men’s professional worldwide golf competition operated by a LIV Golf Party or a LIV Golf Affiliate currently consisting of a season-long, team and individual concurrent world championship played as a series of events (that includes the Events) that has been structured in line with other mainstream sports that incorporate a franchise model and including a fan experience element; |
| **Licence Fees:** | means those Fees that relate to the licensing of a part of the Services, as detailed in rows 1, 2, 4, 5, 6, 8, 9, 11, 13 and 15 of Annex B to this Agreement; |
| **LIV Golf Affiliate:** | means any person who directly or indirectly Controls, is Controlled by or is under common Control with a LIV Golf Party (including any ultimate parent undertaking of LIV Golf Party from time to time and all direct or indirect subsidiary undertakings from time to time of such parent undertaking) (the terms parent undertaking and subsidiary undertaking having the meanings given to them in the English Companies Act 2006); |
| **LIV Golf Indemnitees:** | has the meaning given in Clause 20.1 of Part 4; |
| **LIV Golf Team:** | means a LIV Golf team that participates in the League; |
| **Measurement Period:** | means each calendar month during the Term; |
| **Media Services Engine (Dedicated Platform):** | has the meaning given in Clause 1.1 of Part 3; |
| **Microblock:** | means Supplier’s proprietary methodology for transcoding live video to support both ultra-low latency and synchronization of live video; |
| **Microblock Consumption:** | means the total amount of video and audio data traffic, measured in gigabytes per hour (GB/h), distributed across the associated global Edge Clusters within the GCP Black Box environment; |
| **Network Attached Storage (NAS):** | refers to the LIV Golf Parties’ network-attached storage located onsite, so that the LIV Golf Parties’ can have a high quality (60 frames per second) copy of the video feeds for the LIV Golf Parties’ archive usage; |
| **New Product Support:** | has the meaning given in Clause 11.4.1 of Part 3: |
| **NLP:** | means ‘Natural Language Processing' which is a sub field of AI; |

| | |
|---|---|
| **Order:** | the order for Products, which shall be deemed to be accepted upon execution of this Agreement and with the details as set out at Annex E; |
| **Performance Monitoring Report:** | has the meaning given to it in Clause 3.1 of Annex D; |
| **Players**: | means professional golfers competing in the League; |
| **Pre-Existing Materials:** | means all documents, data, know-how, methodologies, software, technologies, and other materials, including computer programs, reports, and specifications, provided by or used by the Supplier in connection with performing the Services, in each case developed or acquired by the Supplier before the commencement or independently of this Agreement, including without limitation, the Supplier's encoders, microblock technology, and stream management and monitoring platforms; |
| **Product Prices:** | the prices of the Products as determined in accordance with Clause 13.1 of Part 4; and **Product Price** shall have the meaning of the price of an individual Product in accordance with such clause; |
| **Products Payment Schedule:** | means the payment terms set out in the "Products Payment Schedule" section in Part 1; |
| **Products:** | shall mean the products as described in Annex E of this Agreement and shall include any documents and products which would reasonably be expected to be provided in relation to the products described at Annex E, including any associated products and materials provided to Supplier by the retailer of any component part of the Products; |
| **Purchase Amount:** | shall have the meaning given to it in the "Purchase Amount" section in Part 1; |
| **Relevant Anti-Bribery Requirements:** | has the meaning given in Clause 23.1 of Part 4; |
| **Relevant Anti-Tax Evasion Requirements:** | has the meaning given to it in Clause 23.3.3 of Part 4; |
| **Restricted Transfer:** | means an International Transfer where the country, territory or jurisdiction in which the personal data is received is not subject to a valid Adequacy Decision in force at the time of that transfer or at any time after that transfer; |
| **Rules Bunker Application:** | has the meaning given in Clause 7.1 of Part 3; |

| | |
|---|---|
| **Rules Bunker Application Licence:** | has the meaning given in Clause 7.3 of Part 3; |
| **Rules Officials:** | has the meaning given in Clause 7.1 of Part 3; |
| **Sanctions:** | has the meaning given in Clause 24 of Part 4; |
| **SDI:** | has the meaning given in Clause 2.1.2 of Part 3; |
| **Season:** | means each calendar year period from 1 January to 31 December during the Term; |
| **Service Credit:** | means any service credit that is payable in respect of a Service Level Failure; |
| **Service Level Failure:** | means a failure by the Supplier to deliver any part of the Services in accordance with the Service Levels; |
| **Service Level:** | means the qualitative and quantitative performance standards and commitments for the Services set out in Annex D; |
| **Service Personnel:** | means any person employed or engaged by the Supplier in the provision of the Services; |
| **Services Fees:** | has the meaning given in the "Services Fees" section in Part 1; |
| **Services Payment Schedule:** | means the payment terms set out in the "Services Payment Schedule" section in Part 1; |
| **Services:** | has the meaning given in the "Services" section in Part 1; |
| **ShotVu Application:** | has the meaning given in Clause 5.1 of Part 3; |
| **ShotVu Application Licence:** | has the meaning given in Clause 5.3 of Part 3; |
| **SimpleBet:** | means SimpleBet Inc., a company which operates a betting platform or any other company operating within the business known as 'SimpleBet' and that provides services to a LIV Golf Party; |
| **Streaming Services:** | has the meaning given in Clause 2 of Part 3; |
| **Supply of Products:** | means the supply of the Products by the Supplier in accordance with the terms of this Agreement; |
| **Support Service:** | means the services more particularly set out under Clause 11.1 of Part 3; |
| **Supplier API Licence:** | has the meaning given in Clause 1.2.2 of Part 3; |
| **TeamVu Application:** | has the meaning given to it in Clause 6.1 of Part 3; |

| | |
|---|---|
| **TeamVu Application Licence:** | has the meaning given in Clause 6.3 of Part 3; |
| **Term:** | has the meaning given to it in the "Term" section in Part 1; |
| **Transfer Clauses:** | means either the UK IDTA and/or the C-to-P Transfer Clauses as the case may be; |
| **UDP**: | means the data lake controlled by a LIV Golf Party or Affiliate, which is referred to as the 'Unified Data Platform' where warehouses all fan, statistics, and business data to be used for reporting and syndication; |
| **UK GDPR:** | has the meaning given to it in section 3(10) (as supplemented by section 205(4)) of the Data Protection Act 2018; |
| **User:** | means any personnel (including personnel of third parties) that are authorised by a LIV Golf Party to access the Services or Deliverables; |
| **Variable Fees:** | means the fees for the 2025 and 2026 Seasons as set out below:<br>(c) Fee for the Support Services as detailed at row 16(c) of Annex B);<br>(d) 'Microblock Consumption' and Streaming Services (detailed at row 3 of Annex B); and<br>(e) 'Travel, meals and accommodation for KAM' (detailed at row 17 of Annex B). |
| **Venue:** | means the Event locations; |
| **ViewLift:** | means ViewLift, Inc., a company which operates a scalable end-to-end video streaming platform or any other company operating within the business known as 'ViewLift' and that provides services to a LIV Golf Party; and |
| **VOD:** | has the meaning given in Clause 2.2.7 of Part 3. |

**PART 3**
**SERVICES**

The services to be provided by the Supplier are as below and will be provided with effect from the Commencement Date, unless a different date is specified below.

## 1. MEDIA SERVICES ENGINE (DEDICATED ENVIRONMENT)

1.1. The Supplier shall, with effect from 1st January 2025 in relation to the 2025 Season, and 1st January 2026 with respect to the 2026 Season, provide the LIV Golf Parties with a "**Dedicated Environment Platform Licence**": a licence provided by the Supplier to the LIV Golf Parties for the exclusive use of the Supplier's Streaming Services within the GCP Black Box environment (the "**Media Services Engine (Dedicated Platform)**"). Details of this licence and related services to be provided by the Supplier are below:

1.1.1. **Exclusive Administration and Operational Management:** the Supplier shall retain sole administrative access to the Black Box environment, and shall be responsible for all operational management aspects and ensuring the integrity of the deployed Intellectual Property.

1.1.2. **Microservices Management:** the Supplier shall continuously manage and upkeep the 'Kubernetes Microservices' infrastructure, ensuring operational efficiency and scalability, and performing regular updates.

1.1.3. **Event Coverage:** the license covers fourteen (14) Events per year, and the Supplier shall handle the deployment, management, and support of the Streaming Services platform for each Event.

1.1.4. **Pipeline Maintenance:** the Supplier shall regularly maintain the distribution pipelines between the GCP global Edge Clusters, ensuring high availability and seamless data flow during live Events.

1.1.5. **Integration:** the Supplier shall ensure the Media Services Engine (Dedicated Platform) is seamlessly integrated within the GCP environment.

1.1.6. **Platform Upgrades and Updates:** the Supplier shall implement regular updates and upgrades to the Streaming Services platform, including new features, improvements, and enhancements.

1.1.7. **Event-Specific Operations:** the Supplier shall manage all event-specific operations and customizations for the smooth functioning of each of the covered Events.

1.1.8. **Performance Optimization:** the Supplier shall ensure continual system optimization for performance, including load balancing, resource allocation, and efficiency improvements within the Kubernetes environment.

1.1.9. **Comprehensive Reporting and Analytics:** the Supplier shall provide detailed post-Event reporting and analytics, offering insights into system performance and usage metrics.

This Dedicated Environment Platform License is specific to the use of the Supplier's Streaming Services in the dedicated BlackBox environment within the GCP, covering the outlined services and responsibilities. It does not extend to additional services or events beyond the scope of this Agreement.

1.2. Media Services API

1.2.1. The Supplier will provide a JSON based secure API (https) for utilisation by LIV Golf Parties, ViewLift and SimpleBet. This API will be a server-to-server communication, authenticated through a bearer authentication scheme, a standard form of token authentication, that will enable the LIV Golf Parties and the LIV Golf Affiliates, ViewLift and SimpleBet to securely access the API provided by the Supplier via the Black Box on the GCP.

1.2.2. The API will be subject to a licence (the "**Supplier API Licence**") and a fee as defined in Annex B point 2: 'Supplier API Licence'. The Supplier API Licence covers the following aspects of the API to be provided by the Supplier:

(a) **Access Rights**: the Supplier shall provide unrestricted access to the Supplier's API as detailed in this Agreement, enabling the LIV Golf Parties and the LIV Golf Affiliates, ViewLift and SimpleBet to utilize the API for server-to-server communication within the parameters of the functionalities defined in Clause 1.2.3.

(b) **Security and Authentication**: the Supplier shall ensure secure access to the Supplier's API through HTTPS and bearer authentication scheme, as detailed in the API specifications.

(c) **Technical Support and Maintenance**: the Supplier shall provide ongoing support for the API, including troubleshooting, updates, and maintenance to ensure optimal performance and security.

(d) **Upgrades and Enhancements**: the Supplier shall implement any enhancements or upgrades to the API features and capabilities as mutually agreed by the Parties during the term of this Agreement.

(e) **Licensing Rights**: the Supplier hereby grants the LIV Golf Parties and the LIV Golf Affiliates the non-exclusive rights to use the API for the duration of the Agreement, as per the terms and conditions set forth herein.

(f) **Exclusions**: the Supplier API Licence does not cover any additional services or products not explicitly mentioned in this Agreement, such as additional custom development work, additional software licenses, or third-party services.

1.2.3. Capabilities and customization of this API will include:

(a) fetching manifest information, channels and stream information (per angle, per region);

(b) region identifier service, which will assist LIV Golf Parties, ViewLift and SimpleBet in automatically identifying the closest Edge Cluster to receive the live streaming video at the lowest possible latency for co-locating end-users to the closest region;

(c) thumbnail fetching (per stream, per interval). The Supplier shall extend its regular interval thumbnail image generation utility to serve the latest thumbnail for each stream to LIV Golf Parties, ViewLift and SimpleBet; and

(d) encoder firmware changes to store high bitrate video (1080P @ 50 Mbps) to the onsite NAS and which can be used by the LIV Golf Parties.

1.2.4. In the event that LIV Golf Parties elect to use the services of a B2C video provider other than ViewLift, or a B2B betting feed provider other than SimpleBet, for integration into the Services provided under this Agreement, the Supplier shall have the right to charge LIV Golf Parties for any additional services reasonably required to integrate such new provider(s) into the existing Services framework. Such charges shall be at the Supplier's then current rates for similar integration services. The Supplier will

provide LIV Golf Parties with a written estimate of such additional charges for approval prior to commencing any such integration work.

**2. STREAMING SERVICES**

The Supplier shall provide the following services in relation to stream management:

2.1. Pipeline provisioning:

2.1.1. encoder management, which the Supplier shall provide through a management platform ('Stream') via an online portal where the encoders are listed against the LIV Golf Parties' tenant allowing for remote management of the encoders;

2.1.2. configuration of input sources, allowing a User to view the connected serial digital interface ("**SDI**") video inputs and configure these to desired streaming outputs. For example: 'Input 1' shows the 'Hole 1 Tee Cam' and is linked to the Hole 1 Tee Cam streaming output;

2.1.3. video / audio encoding profiles, enabling the User to configure the output resolutions and adaptive bitrate ladder for the streaming outputs during encoding via templates, allowing for future use of standard templates. For example, the Supplier can create a video encoding profile that generates a 1080P at 5.8Mbps and a 720P at 3.5Mbps, etc. which are configured into profiles which allows the User to create the profile once, then quickly re-use these for different streaming outputs;

2.1.4. overlay management, allowing the User to configure static content and/or graphic overlays directly onto the video feed as part of the encoding process; and

2.1.5. stream / channel output, allowing the User to link an encoded output profile to a specific streaming channel. For example, Input 1 (Hole 1 Tee Cam) is encoded and linked to the Hole 1 Tee Cam streaming output channel.

2.2. Management:

2.2.1. User roles / privileges / security, providing secure access to the 'Stream' online portal via User password and authentication. The LIV Golf Parties' administrator (a member of the LIV Golf Parties' personnel) shall manage the User roles and permissions with associated privileges that govern access;

2.2.2. stream / channel management, allowing the User to control various aspects of the stream output. For example, setting the Content Delivery Network ("**CDN**") and 'Connector Profile' to be used by each streaming output;

2.2.3. global connector distribution, allowing the User to determine the rules to support global real-time latency via the twelve (12) Edge Clusters within the Black Box on the GCP;

2.2.4. CDN / Digital Rights Management ("**DRM**") profile, allowing a User to create the profile of which CDN and DRM to use for each video output. The Supplier shall be utilizing the CDN from Google as part of the GCP environment. DRM shall be managed by the LIV Golf Parties. The LIV Golf Parties shall provide the Supplier with a DRM 'Encryption Key' to encode the video, if required;

2.2.5. manifest management, which allows files to be automatically stored in real-time on the Supplier platform that describe the video stream for the generic LIV Golf video player, defining the available streams and the location of all files required to play the video. This process is managed automatically by the Media Services Engine (Dedicated Platform), enabling the video streaming output's manifest to be adjusted in real-time for specific streaming requirements;

2.2.6. recording management / storage, listing all the recorded content stored in the cloud and enabling the User to delete recorded files that are no longer required;

2.2.7. video on demand ("**VOD**"), allowing post-Event video to be made available to end users (e.g. fans watching an Event) for replay;

2.2.8. usage analytics, allowing a User to report on various consumption metrics that are related to billing of Microblock Consumption, video ingress, video egress and storage. For example, the amount of video data processed through the platform across associated global connectors, as well as the amount of storage used for video content;

2.2.9. stream links provided to ViewLift and SimpleBet, including for the integration of the live video streams into the ViewLift Player comprising two video streaming formats for each video stream, being 'Dynamic Adaptive Streaming' over 'HTTP (MPEG-DASH)' and 'HTTP Live Streaming' ("**HLS**") and any reasonable use by SimpleBet (including the provision by SimpleBet of a 'betting feed' to third parties); and

2.2.10. ensure that Users can interact with the Black Box through the well-defined Supplier interfaces and APIs,

together, Clauses 2.1 and 2.2 of this Part 3 being the "**Streaming Services**".

**3. DATA ENGINE - GCP INTEGRATION**:

**Description**

3.1. The "**Data Engine**" is the Supplier's robust server-side module responsible for ingesting time-stamped data from multiple sources. It formats this data into a unified structure specifically engineered to synchronize with and augment video outputs processed through the Supplier's Streaming Services within the GCP Black Box environment. This integration facilitates the support of Supplier-enabled applications and workflows, enhancing both functionality and efficiency.

3.2. To the extent that delivery has not taken place prior to the Commencement Date, the Data Engine shall be delivered by the Supplier to the LIV Golf Parties within 5 days of the Commencement Date.

**Licence**

3.3. The Supplier shall, with effect from 1st January 2025 in relation to the 2025 Season, and 1st January 2026 with respect to the 2026 Season, provide the LIV Golf Parties with a "**Data Engine Module Licence**": a licence provided by the Supplier to the LIV Golf Parties for the use of the Supplier's Data Engine within the GCP Black Box environment.

**Core Functionalities of the Data Engine:**

3.4. **Data Ingestion**

3.4.1. **Universal Data Reception:** The Data Engine is capable of ingesting time-stamped data from diverse third-party providers via APIs, ensuring broad compatibility and flexibility.

3.4.2. **Customization for Specific Sources:** Custom configurations allow the Data Engine to specifically handle data from the GCP UDP system and Champion Data, optimizing the process tailored to these unique sources.

3.5. **Data Storage**

3.5.1. **Optimized Data Format:** All data ingested is stored in a universally compatible format designed for efficient synchronization, retrieval, and interaction with the Supplier's Streaming Services and applications.

3.6. **Data Synchronization and Integration**

3.6.1. **Seamless Synchronization with Video Streams:** The Data Engine ensures that all data is synchronized with video streams processed through the Supplier's Streaming Services.

3.6.2. **Integration in a Secure Environment:** Integration takes place within the GCP Black Box environment, providing a secure and isolated setting for high-integrity data processing.

3.6.3. **Enhanced Interactivity and Functionality:** The harmonized data and video streams facilitate seamless interactions and coordination among various data types, significantly boosting the efficacy and usability of Supplier-enabled applications and workflows.

**4. DYNAMIC CLOUD MIXER (DCM)**

**Description**

4.1. The DCM is a specialized server-side module developed and maintained by the Supplier. It is uniquely tailored for integration and operation within the GCP Black Box environment. Utilizing the Media Services Engine (Dedicated Platform) alongside the Data Engine, the DCM efficiently processes and combines various data and video sources to generate automated streaming output.

4.2. To the extent that delivery has not taken place prior to the Commencement Date, the DCM and DCM API shall be delivered by the Supplier to the LIV Golf Parties within 5 days of the Commencement Date.

**Licence**

4.3. The Supplier shall, with effect from 1st January 2025 in relation to the 2025 Season, and 1st January 2026 with respect to the 2026 Season, provide the LIV Golf Parties with a "**Dynamic Cloud Mixer Licence**": a licence provided by the Supplier to the LIV Golf Parties for the use of the Supplier's Dynamic Cloud Mixer within the GCP Black Box environment.

**Core Functionalities of the Dynamic Cloud Mixer ("DCM"):**

4.4. **Automated Streaming Output**

4.4.1. **Dynamic Video Input Switching:** The DCM utilizes real-time data from the Data Engine to dynamically select video inputs from available streams on the Supplier's Media Services Engine (Dedicated Platform), adapting the output based on ongoing Events.

4.4.2. **Customized Streaming Experiences:** Enables the creation of personalized streams that can focus on Players, LIV Golf Teams, or specific groups, enhancing viewer engagement and satisfaction.

4.5. **Integration with Media and Data Services**

4.5.1. **Seamless Deployment and Integration:** Positioned within the GCP Black Box environment, the DCM integrates flawlessly with both the Supplier's Media Services Engine (Dedicated Platform) (including microblock transcoding and distribution of live video feeds) and the Data Engine, accessing essential data and video sources for stream generation.

4.5.2. **Enhanced Stream Generation Capabilities:** Ensures comprehensive access to real-time data and video inputs, essential for dynamic streaming output.

4.6. **Multiple Output Video Streams**

4.6.1. **Diverse Format Support:** Capable of generating multiple output video streams in both DASH and HLS formats, accommodating various viewer preferences and technical specifications.

4.6.2. **Data-Driven Content Selection:** Uses event-based data triggers to intelligently switch between video streams, focusing on delivering the most pertinent and captivating content instantly.

4.7. **HTML5 Overlay Ingestion**

4.7.1. **Advanced Overlay Capabilities:** The DCM integrates HTML5 overlays, such as those from 'Singular Live', directly into the video streams, enriching the broadcast with additional graphical information and interactivity.

4.7.2. **Enhanced Viewer Engagement:** This functionality not only enhances the visual presentation but also layers additional contextual information, making the viewing experience more informative and engaging.

4.8. **DCM API Integration**

4.8.1. **Extensive API Functionality:** The DCM API extends the capabilities of the Supplier API (and as such, shall be subject to the rights in Clauses 1.2.2(a) to 1.2.2(f)), enabling robust integration with both front-end and back-end systems that utilize the streams it generates.

4.8.2. **Stream Accessibility for Developers:** Facilitates developers in embedding DCM-generated streams within their applications, ensuring a cohesive and seamless integration that enhances user experience.

**5. SHOTVU APPLICATION**

**Description**

5.1. The "**ShotVu Application**" is a proprietary application developed and maintained by the Supplier, ensuring secure access for Players and their support teams to live and on-demand video streams of each Event of the 2025 and 2026 Seasons. This application is engineered to support the automated generation of video highlights and facilitates the easy downloading of these segments, enhancing both engagement and performance analysis for Players and LIV Golf Teams.

5.2. The ShotVu Application shall, subject to a LIV Golf Party requesting the commencement of the ShotVu Application Licence in accordance with Clause 5.3 below, be delivered by the Supplier to the LIV Golf Parties within 7 days of the receipt of such request by the Supplier.

**Licence**

5.3. The Supplier shall, upon and with effect from the date of any request from a LIV Golf Party (such date being the relevant Acceptance Date), provide the LIV Golf Parties with a "**ShotVu Application Licence**": a licence provided by the Supplier to the LIV Golf Parties for the use of the Supplier's ShotVu application. To the extent that such Acceptance Date falls within the 2025 Season, the ShotVu Application Licence shall, with respect to the 2026 Season, take effect from 1 January 2026.

5.4. The Parties agree and acknowledge that:

5.4.1. nothing in Clause 5.3 above nor otherwise in this Agreement shall be deemed to obligate the LIV Golf Parties to request the commencement of the ShotVu Application Licence;

5.4.2. to the extent such request is given by a LIV Golf Party at any time after the first Event with respect to either the 2025 Season or the 2026 Season, the fees payable by the

LIV Golf Parties with respect to the ShotVu Application Licence and Support Services in relation to the ShotVu Application as set out in rows 6 and 16(f) of Annex B respectively shall be pro-rated with respect to the remaining Events in such Season (on the basis there are 15 Events per Season) and the fees in such rows shall be deemed amended with respect to such Season accordingly (such that, by way of example only, if such request is given by a LIV Golf Party after the first Event with respect to any Season but before the second Event in such Season, the ShotVu Application Licence fee payable in accordance with row 6 of Annex B for such Season would be $50,400.00 ($54,000 * 14/15) and the Support Services fee with respect to the ShotVu Application for such Season would be $5,040.00 ($5,400 * 14/15); and

5.4.3. to the extent that the fees in relation to the ShotVu Application Licence and the Support Services in relation to the ShotVu Application are nil or pro-rated with respect to any Season in accordance with this Clause 5.4, the Services Fees and Services Payment Schedule sections of Part 1 to this Agreement shall also be deemed amended accordingly.

**Core Functionalities of ShotVu:**

5.5. **Secure Access**

5.5.1. **Robust Authentication:** ShotVu features a sophisticated login system that ensures secure access, allowing only authorized Players and their support teams to access the platform, safeguarding sensitive information and media.

5.6. **Live and Video On Demand (VOD) Streams**

5.6.1. **Access to Live and Past Events:** Users have the capability to watch live broadcasts of ongoing Events and access VOD content of previous League Tournaments.

5.6.2. **High-Quality Streaming:** All video streams are delivered via the Supplier's reliable Streaming Services, ensuring a high-quality viewing experience.

5.7. **Interactive Video Player**

5.7.1. **Enhanced Viewer Interaction:** The application boasts an interactive video player that incorporates real-time overlays, displaying crucial Event information such as course details and leaderboards.

5.7.2. **Extensible Overlays:** Overlays are designed to integrate seamlessly with detailed analytics from the GCP UDP system, Champion Data and other vendors, enriching the viewer experience with advanced data insights.

5.8. **Interactive Scorecard**

5.8.1. **Replay and Analyze Shots:** Features an interactive scorecard that allows Users to replay specific shots in real-time or after the event, with options for slow-motion and frame-by-frame analysis, enhancing strategic review and performance improvement.

5.9. **Downloadable Shot Replays**

5.9.1. **Download Capabilities:** Players and their support teams can download replays of specific shots for detailed offline review and training purposes.

5.9.2. **Controlled Content Sharing:** Download permissions can be meticulously managed by LIV Golf Parties to align with content distribution policies, ensuring ethical and secure dissemination of footage.

5.10. **Client-Side Data Integration**

5.10.1. **Real-Time Data Interaction:** The video player integrates client-side data to provide up-to-the-minute updates, enhancing interactivity and personalization of the viewing experience.

**6. TEAMVU APPLICATION**

**Description**

6.1. The "**TeamVu Application**" is a secure solution designed and maintained by the Supplier, optimized for hospitality suites used by LIV Golf Teams at Events. It enhances the on-site experience by providing an interactive video player that tailors content display for each LIV Golf Team, ensuring all Players and their guests enjoy a superior viewing experience.

6.2. The Supplier shall build, integrate and customise the TeamVu Application for the LIV Parties by no later than February 6th, 2025.

**Licence**

6.3. The Supplier shall, with effect from the Acceptance Date of the TeamVu Application in relation to the 2025 Season, and 1st January 2026 with respect to the 2026 Season, provide the LIV Golf Parties with a "**TeamVu Application Licence**": a licence provided by the Supplier to the LIV Golf Parties for the use of the Supplier's TeamVu application.

**Core Functionalities of TeamVu:**

6.4. **Interactive Video Player**

6.4.1. **Multi-View Display:** TeamVu's interactive video player uniquely presents a four-up display, each quadrant dedicated to one of the four Players on each LIV Golf Team, enabling simultaneous viewing of all Players of a LIV Golf Team.

6.4.2. **Dynamic Content Management:** Alongside the main program stream, an additional player displays cycling shot replays of each Player, enriching the engagement and coverage of the Event.

6.5. **Data Integration**

6.5.1. **Real-Time Information:** Integrates real-time data to provide current game insights, Player statistics, and LIV Golf Team performance directly on the screen, making information readily accessible and enhancing the overall viewer experience.

6.5.2. **Enhanced Information Presentation:** Data is displayed clearly and interactively, augmenting the strategic understanding and engagement of viewers.

6.6. **Banner Advertising**

6.6.1. **Event-Specific Advertising:** Features the ability to display tailored banner advertising pre-loaded for each Event, strategically integrated into the user interface to balance visibility with user experience.

6.6.2. **Seamless Integration:** Advertisements are incorporated into the interface in a way that complements, rather than distracts from, the main content.

6.7. **Private Streaming**

6.7.1. **Exclusive Access:** Available exclusively on-site at each Event, TeamVu provides a private streaming service tailored specifically for Players and their guests, ensuring a personalized viewing experience.

6.8. **Customization and Flexibility**

6.8.1. **Tailored User Interface:** The interface of TeamVu can be customized upon request to meet specific requirements set by the LIV Golf Parties and the LIV Golf Teams, offering flexibility to align with Event themes and LIV Golf Team preferences.

6.8.2. **Personalized Viewing Experience:** This level of customization guarantees that the platform caters specifically to the needs and preferences of the LIV Golf Parties or its event management companies and participating LIV Golf Teams, maximizing relevance and satisfaction.

**7. RULES BUNKER**

**Description**

7.1. The "**Rules Bunker Application**" is an advanced application developed and maintained by the Supplier, specifically crafted to support the rules officials of the League ("**Rules Officials**") in the oversight and decision-making processes during Events. The application enhances rule enforcement through its sophisticated video review system, composed of 'Controller Interface', 'Monitoring Interface', and 'Video Wall' components.

7.2. The Rules Bunker Application and/or any updates thereto shall be delivered by the Supplier to the LIV Golf Parties by no later than February 6th, 2025.

**Licence**

7.3. The Supplier shall, with effect from 1st January 2025 in relation to the 2025 Season, and 1st January 2026 with respect to the 2026 Season, provide the LIV Golf Parties with a "**Rules Bunker Application Licence**": a licence provided by the Supplier to the LIV Golf Parties for the use of the Supplier's Rules Bunker application.

**Core Functionalities of Rules Bunker:**

7.4. **Video Feed Monitoring**

7.4.1. **Comprehensive Feed Access:** Enables Rules Officials to monitor multiple video feeds simultaneously, both locally and remotely, ensuring comprehensive visual coverage of ongoing events.

7.4.2. **Informed Decision-Making:** Provides Rules Officials with extensive visual data, aiding them in making accurate and informed decisions during Events.

7.5. **Time-Specific Review**

7.5.1. **Precise Video Navigation:** Rules Officials can navigate to specific timestamps within video feeds, crucial for scrutinizing moments or incidents with accuracy.

7.5.2. **Enhanced Adjudication Tools:** This feature supports detailed playback and review, facilitating exact and fair Event adjudication.

7.6. **Controller Interface**

7.6.1. **Intuitive Control System:** This central interface allows Rules Officials to select and manipulate camera angles, controlling playback and navigation within the video feeds.

7.6.2. **Efficient Video Management:** Ensures Rules Officials have quick and effective access to the necessary video content, streamlining the review process.

7.7. **Monitoring Interface**

7.7.1. **Dedicated Incident Review Interface:** Displays video feeds specifically for incident review, enhancing focus on critical moments.

7.7.2. **Integrated Production Output:** Supports output to the LIV Golf Parties' production workflows through 'HDMI' to 'SDI' conversion, aligning review processes with broader broadcast operations.

7.8. **Video Wall**

7.8.1. **Multi-View Display Setup:** Offers diverse layout options, enabling the display of multiple video streams on separate monitors for comprehensive live monitoring.

7.8.2. **Real-Time Situational Awareness:** Provides a panoramic view of ongoing activities, ensuring officials have a holistic understanding of the Event dynamics for effective monitoring and quicker response.

**8. CLIP REPLAY GENERATOR**

**Description**

8.1. The "**Clip Replay Generator**" is a sophisticated server-side module developed and maintained by the Supplier. It capitalizes on the capabilities of the Data Engine to identify and compile video segments from various streams managed by the Media Services Engine (Dedicated Platform). This technology is crucial for crafting 'Video on Demand' ("VOD") instant replays, offering seamless integration into diverse applications and systems.

8.2. The Supplier shall build, integrate and customise the Clip Replay Generator for the LIV Parties by no later than February 20th, 2025.

**Licence**

8.3. The Supplier shall, with effect from the Acceptance Date of the Clip Replay Generator Service in relation to the 2025 Season, and 1st January 2026 with respect to the 2026 Season, provide the LIV Golf Parties with a "**Clip Replay Generator Module Licence**": a licence provided by the Supplier to the LIV Golf Parties for the use of the Supplier's Clip Replay Generator module.

**Core Functionalities of the Clip Replay Generator**:

8.4. **Data-Driven Video Segmentation**

8.4.1. **Targeted Segment Extraction**: Utilizes the Data Engine to accurately pinpoint and extract pertinent video segments from multiple streams, ensuring relevant content capture.

8.4.2. **Precision and Efficiency**: Focuses on extracting precisely the right moments for replay, enhancing the relevance and value of the content.

8.5. **Compilation into Separate Video Stream**

8.5.1. **Dedicated Replay Streams**: Merges extracted segments into a distinct video stream tailored for VOD instant replays, designed to deliver a smooth and high-quality playback experience.

8.5.2. **Optimal Viewing Quality**: Ensures that the compiled stream meets high standards of video quality, providing viewers with an exceptional replay experience.

8.6. **Integration with Dynamic Cloud Mixer**

8.6.1. **Enhanced Content Delivery**: The generated VOD replays are seamlessly fed into the DCM, augmenting its capabilities in creating enriched video streams.

8.6.2. **Streamlined Content Utilization**: Facilitates the DCM's access to replay content, maximizing the impact and utility of both modules in live and on-demand scenarios.

8.7. **Application Integration**

8.7.1. **Versatile Use Across Platforms**: Ensures that the outputs of the Clip Replay Generator are compatible and integrable with various Supplier-developed applications, promoting extensive usability.

8.7.2. **Expanded Functionality**: By making replay content available across multiple platforms, it enhances the functional depth and user engagement of the Supplier's application suite.

## 9. KLIPVU APPLICATION

**Description**

9.1. "**KlipVu**" is a real-time video clipping and content generation platform that integrates the Data Engine and Media Services Engine (Dedicated Platform). It uses time-coded data to automatically create, manage, and distribute video clips from live or recorded camera feeds.

9.2. The Supplier shall build, integrate and customise the KlipVu Application for the LIV Parties by no later than June 16th, 2025.

**Licence**

9.3. The Supplier shall, with effect from the Acceptance Date of the KlipVu Application in relation to the 2025 Season, and 1st January 2026 with respect to the 2026 Season, provide the LIV Golf Parties with a "**KlipVu Application Licence**":

**Core Functionalities of KlipVu:**

9.4. **Logic:** This is a back-end module that reads data from the Data Engine and uses this to drive the clipping service set out below and to store metadata about each clip. This module is expanded to incorporate logic for triggered events and search requirements.

9.5. **Data-Driven Clipping**: This module synchronizes time-stamped events with separated video segments to generate precise clips in real time, for immediate sharing / publication, or further processing.

9.6. **Computer Vision**: enables a crop-box to follow specific movement and then generate secondary output clips in a variety of different resolutions.

9.7. **Clip Processor**: applies visual and audio changes to a specific clip, such as lowering or removing audio, and joining selected individual clips together as one clip output.

9.8. **Tagging and Filtering**: Allows tagging and advanced filtering based on event types, Players, or custom metadata.

9.9. **Overlay Manager**: Applies both static and animated overlaps to a clip, or applies data-driven widgets.

9.10. **Rating System**: Applies data-driven ratings to clips using event significance or custom metrics.

9.11. **Export and Sharing**: Supports exporting to social media, CMS, and third-party systems with branding and formatting options.

9.12. **Scalability**: Built on a Kubernetes-based infrastructure, KlipVu scales to handle high-demand workflows.

## 10. KODE APPLICATION (FOR AI CADDIE)

**Description**

10.1. The "**Kode Application**" is an advanced application layer engineered to query, calculate, test, and report on large volumes of data within a data engine. The Supplier will support the development of the AI Caddie application by adapting and customizing the Kode Application to enable AI Caddie's NLP-driven data and video segment retrieval functionalities, including

collaborating with any requirements of Deltatre with respect to AI Caddie, reconfiguring the Kode Application's architecture, enhancing its API, and establishing a reporting and metrics system aligned with AI Caddie's operational requirements. The Parties acknowledge that the custom video integration delivered by the Supplier is a top priority feature for the AI Caddie project, which will allow users access to video clips of the most exciting plays, Player performances, and critical shots from the Event. Users will also be able to request exclusive content such as specific highlights; favorite Player's top moments or key shots from a particular round at an Event.

10.2. The Parties agree that the Services in Clause 10.1 above shall be provided by no later than April 30th, 2025.

**Licences**

10.3. The Supplier shall, with effect from the Acceptance Date of the Kode Application and Kode API in relation to the 2025 Season, and 1st January 2026 with respect to the 2026 Season, provide the LIV Golf Parties with a **"Kode Licence"**: a licence provided by the Supplier to the LIV Golf Parties for the use of: (a) the Kode Application; and (b) the Kode API, each within the GCP Black Box environment.

**Core Functionalities of the Kode Application:**

10.4. **Adaptation of Kode Application**

The Supplier will configure the Kode Application to facilitate AI Caddie's processing, retrieval, and display of data metrics and video segments from the UDP, including:

10.4.1. **Event Code Mapping**: Defining and configuring 'Event Codes' to allow AI Caddie to map requests to raw data within the UDP, ensuring seamless data ingestion and storage.

10.4.2. **Calculator Development**: Customizing and refining calculators within the Kode Application to process requests from AI Caddie, generating actionable metrics and video segments tailored to AI Caddie's NLP engine requirements.

10.4.3. **Custom Reporting Layer**: Developing a reporting layer for data query visualization and video segment testing, supporting continuous refinement and iterative improvements.

10.4.4. **Playlist Generation**: Enabling time-based segmentation of video content based on generated metrics, allowing AI Caddie users to review targeted video clips within the application.

10.5. **API Enhancement**

The Supplier will expand the Kode API to meet the advanced querying and data retrieval requirements of AI Caddie. Specific enhancements include:

10.5.1. **Complex Query Support**: Enabling the execution of both predefined and ad-hoc queries to handle various AI Caddie request complexities.

10.5.2. **Push Mechanism for Rapid Delivery**: Integrating a push mechanism for immediate data and video result delivery to AI Caddie's pipeline, ensuring prompt responses to NLP-driven requests.

10.5.3. **Query Caching**: Implementing caching mechanisms to optimize response times and manage high query volumes, providing efficient performance under load.

10.5.4. **Audit and Iteration Support**: Enabling detailed query logging and metadata, facilitating AI Caddie's auditing and iterative refinement processes.

10.6. **Kode Application Adaptations**

The Supplier will adapt the Kode Application to meet the requirements of AI Caddie as follows:

10.6.1. **Create and Configure Event Codes:** Define and configure Event Codes that map the Data Engine to the raw data housed within the UDP. This ensures that the Data Engine can ingest, transform, and store data in a manner that the Kode Application can effectively utilize, providing the foundation for accurate data handling and processing.

10.6.2. **Development and Refinement of Re-usable Calculators:** Assist the AI Caddie project by developing and refining reusable calculators necessary to process and respond to requests from AI Caddie. These calculators will be configured to generate accurate metrics and video segments as required by the natural language processor, ensuring precise and relevant results.

10.6.3. **Configure the Reporting Layer:** Customize the reporting layer to visualize the results of queries and enable the retrieval of video stored in the Media Services Engine (Dedicated Platform). This customization allows users to test and evaluate the returned data and video segments effectively, facilitating iterative improvements and adjustments as needed.

10.6.4. **Playlist functionalities for time-based video segment generation**: enable the creation, filtering, grouping, and sharing of time-based video segments, leveraging the Data Engine to identify content based on event triggers and metadata. Users can filter segments by criteria such as Player actions, scoring events, or custom tags and group related segments into organized playlists for streamlined viewing and analysis. These playlists are customizable, allowing Users to add, remove, or rearrange segments as needed.

10.7. **Kode API Customization & Licence Features**

The Supplier will develop a specialized version of the Kode API specifically designed to support the AI Caddie project and exclusive to the LIV Golf Parties. This API will enhance the capabilities of AI Caddie in handling complex data queries and delivering accurate results, tailored to the specific needs of the project. Such developments will include:

10.7.1. **Support for Querying:** comprehensive support for both pre-built and ad-hoc queries from AI Caddie. This flexibility ensures that AI Caddie can efficiently handle varying levels of query complexity, from simple requests to intricate, multi-layered queries.

10.7.2. **Push Mechanism for Rapid Delivery:** implementing a push mechanism to ensure rapid delivery of results into the pipeline. This ensures timely responses to the natural language processor requests from AI Caddie, as well as accommodating real-time data changes during live Events, which is crucial for maintaining up-to-date and accurate data streams.

10.7.3. **Query Caching:** integrating query caching to optimize delivery speed and support load balancing. This feature enhances performance by reducing query processing times and managing high query volumes effectively, ensuring that the system remains responsive even under heavy load.

10.7.4. **Auditing and logging tools for query monitoring and improvement**: designed to monitor and log API requests, capturing detailed information about queries processed by the platform. These tools enable LIV Golf to analyze request patterns, identify inefficiencies, and refine algorithms to enhance product accuracy and performance. By providing actionable insights into query usage and outcomes, the system ensures continuous improvement and alignment with user expectations.

The Kode Licence covers the following aspects of the Kode API to be provided by the Supplier:

10.7.5. **Access Rights**: the Supplier shall provide unrestricted access to the Kode API as detailed in this Agreement, enabling the LIV Golf Parties and the LIV Golf Affiliates to

utilise the API for server-to-server communication within the parameters of the functionalities defined in Clause 10.7.

10.7.6. **Security and Authentication**: the Supplier shall ensure secure access to the Kode API through HTTPS and bearer authentication scheme, as detailed in the Kode API specifications.

10.7.7. **Technical Support and Maintenance**: the Supplier shall provide ongoing support for the Kode API, including troubleshooting, updates, and maintenance to ensure optimal performance and security.

10.7.8. **Upgrades and Enhancements**: the Supplier shall implement any enhancements or upgrades to the Kode API features and capabilities as mutually agreed by the Parties during the term of this Agreement.

## 11. SUPPORT SERVICES

11.1. The Supplier shall, throughout the period the respective Service is to be provided, provide a support service (the "**Support Service**") in relation to the Services, including support in relation to:

(a) any API provided by Supplier;

(b) the Media Services Engine (Dedicated Platform) and Black Box in GCP;

(c) the Streaming Services (MicroBlock Consumption);

(d) the Data Engine;

(e) the Dynamic Cloud Mixer;

(f) subject to a LIV Golf Party requesting the commencement of the ShotVu Application Licence in accordance with Clause 5.3 of this Part 3, the ShotVu Application;

(g) the TeamVu Application;

(h) the Rules Bunker Application;

(i) the Clip Replay Generator;

(j) the KlipVu Application; and

(k) the Kode Application.

The Support Service shall include all matters listed at Clauses 11.2 - 11.6.2 below and Annex D.

<u>Support Tiers</u>

11.2. The Supplier shall provide the LIV Golf Parties with three tiers of support to deliver world-class feeds anywhere in the world, as set out below. For each of these three tiers, the Supplier and its support team, including any of the Supplier's technicians and developers, will use their commercially reasonable endeavours to proactively monitor and resolve any issues that arise quickly and efficiently in accordance with the below and Annex D.

11.2.1. <u>Onsite support via Key Account Manager ("**KAM**")</u>

The Supplier's first level of support includes a Supplier technician (the KAM) who will manage the set-up and provide in-person technical support. The Supplier's highly trained and experienced technicians shall support the setup of all equipment so that the technology functions optimally. The responsibility of the on-site KAM shall include, but not be limited to, the following:

(a) providing training in relation to the Existing Products, Products and Services where required;

(b) assisting with the setup and configuration of the Products and Services;

(c) troubleshooting any Existing Product and Product hardware issues;

(d) helping with problems or defects identified in the software;

(e) performing software updates as required; and

(f) ensuring the Services are provided in accordance with any technical specification agreed to by ViewLift, SimpleBet, Deltatre, Supplier and a LIV Golf Party, with a LIV Golf Party to be notified in advance of and have a right to reject any specification agreed directly between Supplier and ViewLift, Deltatre or SimpleBet.

11.2.2. Remote support team

(a) The Supplier's second layer of support includes the Supplier's highly skilled remote support team, which will monitor all streaming operations in real-time using advanced monitoring and communication systems. The Supplier's team shall be available at any time required by the LIV Golf Parties to provide proactive assistance to resolve any issues that arise quickly and efficiently. The Supplier's remote support team will have direct communication with the on-site support technician, allowing for seamless communication between all layers of support. This team can be contacted via support@mobii.com.

11.2.3. Technical support team

(a) The Supplier's third level of support includes senior developers on standby to address any issues that are escalated.

11.3. Support Tier Activation Phases

The Support Tiers will be activated at three different stages:

11.3.1. Pre-Event Support

This phase of support is made available throughout the time period (7 days a week) outside the scheduled days of each Event. The Supplier's KAM will be available for direct support via telephone, email and instant messaging platforms (example: Slack) with a response time commitment of 12 hours.

11.3.2. Event Support

This phase of support includes the time period during which there are scheduled Events, including one day prior to the Event start. The KAM will be present onsite at the Event location and available for immediate and direct support via in-person interaction, email, telephone communication and instant messaging platforms (example: Slack). The KAM will liaise with the Supplier's remote support and technical team as necessary.

11.3.3. Live Event Support

This phase of support is activated on live Event days, where all support tiers will be accessible for immediate and direct assistance during the 3 hours prior to the Event, during the live Event and three hours post the Event via email, telephone and instant messaging platforms (example: Slack).

11.4. Product Support

11.4.1. The Supplier shall provide comprehensive support for (i) the Existing Products (the "**Existing Product Support**"), and (ii) all Products provided by the Supplier (the "**New Product Support**"), as further detailed in this Clause 11.4, and will use its commercially reasonable endeavours to maintain the Existing Products and the Products so that they perform optimally and resolves any issues that may arise with the Existing Products and Products quickly and efficiently.

11.4.2. The Supplier's team of experienced professionals shall proactively monitor the Existing Products' and Products' performance and identify any issues that might impact performance. If there is a problem identified with any Existing Product or Product components that prevents the Supplier from providing the Services at the standards described herein, and provided that such problem is not as a result of the negligence of or improper use of such components by a LIV Golf Party, the Supplier shall repair or replace and then maintain those components throughout the Term at no additional cost to the LIV Golf Parties.

11.4.3. The Supplier shall update all firmware and software to: (i) Existing Products; and (ii) the Products. The Supplier shall use its commercially reasonable endeavours to keep such Existing Products and Products equipped with the latest technology and features and operating at their best performance.

11.4.4. Without limitation to the foregoing, the Supplier shall provide to the LIV Golf Parties, the support services in relation the Existing Products and Products (as appropriate) as set out below:

(a) product warranty for 12 months from date each Product is delivered to a LIV Golf Party or, where such Product is being held by Supplier on behalf of the LIV Golf Parties, 12 months from date that Supplier takes possession of such Product;

(b) parts/whole unit replacement delivery within 5 Business Days - applies to estimated shipment delivery transport time to destinations within the United States. Off-the-shelf parts ship within 2 Business Days of request. Replacement of a complete unit has a lead time of 3 Business Days. Delivery times are based on the time from receipt of the returned Existing Product or Product. If the relevant LIV Golf Party is located outside the United States, they will receive the specified delivery time to the point of importation. Notwithstanding the foregoing, although the Supplier will use commercially reasonable efforts to achieve the replacement and delivery timelines specified in this Clause 11.4.4(b) such replacement and delivery timelines are subject to change due to factors beyond the reasonable control of the Supplier;

(c) The Supplier acknowledges the criticality of uninterrupted product functionality during operations. To ensure seamless performance, the Supplier agrees to support the replacement of specific hardware components of the Products at no additional cost to LIV Golf Parties. This service, termed "advance parts exchange", encompasses the following limited components:

(1) graphical processing unit (GPU);

(2) SDI capture card; and

(3) power supply.

In the event of a malfunction or identified issue with any of the mentioned components, not resulting from the negligence of LIV Golf Parties, the Supplier shall initiate the advance parts exchange process promptly. This process will entail:

(d) Evaluation: Upon notification or identification of an issue with any of the mentioned components, the Supplier's technical team will conduct an evaluation to verify the need for replacement.

(e) Replacement: Once confirmed, the Supplier will promptly ship the replacement component(s) to the designated location specified by LIV Golf Parties.

(f) Return of Defective Component(s): Simultaneously, LIV Golf Parties shall return the defective component(s) within a stipulated timeframe as specified by the Supplier, following the provided return instructions. The returned component(s) should be in a condition as prescribed by the Supplier.

(g) Expedited Shipping: The Supplier will utilize expedited shipping methods to ensure the timely delivery of replacement components, minimizing operational downtime.

11.5. <u>Software support</u>

11.5.1. The Supplier shall provide to the LIV Golf Parties, the support services as set out below:

(l) software support and warranty period for 12 months. The Supplier's software warranty provides software support and defect resolution for 12 months from the Commencement Date. The Supplier supports defect fixes for the two most recent major releases (but only when technically feasible within those specific versions). Without prejudice to Clause 5.1.2 of Part 4, defect resolution may require the LIV Golf Parties to upgrade to a newer version of the Supplier's software for the Products, as notified by the Supplier but at no cost to the LIV Golf Parties;

(m) access to maintenance releases is provisioned through the software interface for the Products, enabling either the KAM or LIV Golf Parties to initiate the maintenance release. In addition to this, the Supplier's 'Remote Support Team' can apply these updates by remotely accessing the Products; and

(n) access to major upgrade releases is provisioned through the software interface for the Products, enabling either the KAM or LIV Golf Parties to initiate the maintenance release. In addition to this, the 'Remote Support Team' can apply these updates by remotely accessing the Products.

11.6. <u>Other</u>

11.6.1. The Support Services will not include:

(o) developing custom software; or

(p) assisting with complex integration of the Supplier solutions with third-party solutions or into customer environments, including complex network configurations, other than as set out in this Agreement.

11.6.2. The LIV Golf Parties shall receive the benefit of Supplier third party hardware and software component licences and support. The Supplier confirms that it has the following policy regarding the use of third party or unqualified components, including power supplies, hard drives, chassis, 'PCIe' components (including network interface cards, fiber channel cards, 'HD-SDI' cards), and other hardware components:

(q) if LIV Golf Parties use any third-party (other than any third-party component supplied by Supplier) component in a device running the Supplier's Streaming Services software and a fault or performance issue is traced to the use of this third-party component, then at the Supplier's reasonable discretion, support and warranty service may be withheld;

(r) if a product fault or performance issue is determined by the Supplier to not be related to the use of third-party or qualified components, then the Supplier shall in the first instance, notify the LIV Golf Parties and will otherwise continue to support the LIV Golf Parties in accordance with this Agreement;

(s) at no time will hardware support be provided for third-party components by the Supplier (other than any third-party component supplied by Supplier). If hardware is replaced and the fault or performance issue is determined to have been caused by the installation of a third-party component (other than any third-party component supplied by Supplier), the Supplier reserves the right to charge for reasonable time and material rates for the service provided;

(t) it is acknowledged by the LIV Golf Parties that if any LIV Golf Party makes custom changes to the operating system configurations or installs third-party software package(s) on a device running the Supplier's Streaming Services software, without previous qualification and approval by the Service Personnel, and a fault or performance issue is traced to the use of these configurations or third-party software packages, then at the Supplier's reasonable discretion, support and warranty services may be withheld; and

(u) if a product fault or performance issue is determined to not be related to the matters described at Clauses 11.6.2(q) - 11.6.2(t) above, then the Supplier shall continue to support the LIV Golf Parties in accordance with this Agreement.

## 12. ACCEPTANCE

12.1. On delivery of Services (excluding the Support Services) for which a build, integration, and/or customisation is to be performed as part of the Service, or to which an update is to be performed, the LIV Golf Parties can run appropriate tests on such Services, as applicable, and a LIV Golf Party shall provide written notice to the Supplier of:

12.1.1. any failures or defects for which the Supplier shall remedy promptly to the best of its ability, including providing replacement parts and/or technical support as required; or

12.1.2. the LIV Golf Parties' confirming acceptance of the respective Services to the Supplier.

12.2. The Parties acknowledge and agree that, where any updates to Services performed by the Supplier result in the a LIV Golf Party providing a notice of failures or defects under Clause 12.1.1, such Services shall be rolled back to the previous live version while the Supplier promptly remedies such failures or defects, such that the LIV Golf Parties continue to receive the Services in accordance with the Service Levels set forth on Annex D.

12.3. Acceptance of the respective Services shall be deemed to have otherwise occurred on whichever is the earliest of:

12.3.1. the LIV Golf Parties confirming its acceptance in accordance with Clause 12.1.2 or its acceptance after re-testing should any failures or defects have been detected in the first instance; and

12.3.2. the use of the respective Services by the LIV Golf Parties in the normal course of its business,

the "**Acceptance Date**" of the respective Services.

## PART 4
## TERMS AND CONDITIONS

**1. TERM & PRIOR AGREEMENTS**

1.1. This Agreement shall be deemed to commence on the Commencement Date, subject to it being acknowledged by the Parties that the Supplier has been performing some of its obligations under this Agreement, with respect to the build, integration and customisation of certain Services, including the TeamVu Application, the Clip Replay Generator and the Kode Application Services as set out in Clauses 6.2, 8.2, and 10.2 of Part 3 respectively, prior to the Commencement Date and this Agreement documents the terms on which the Supplier has been doing so and that this Agreement shall apply to the provision of such obligations performed prior to the Commencement Date. This Agreement shall continue, unless terminated earlier in accordance with Clause 19, for the duration of the Term. It shall terminate automatically without notice at the expiry of the Term.

1.2. The Parties acknowledge that that, as a result of the Term set out in Clause 1.1 of this Part 4 to this Agreement, this Agreement shall be partially coterminous with both the 2024 Services Agreement and the 2024 Supply of Goods Agreement, but that the terms of this Agreement are without prejudice to the terms of those agreements. The Parties further acknowledge that the Services, licences and Supply of Products contained herein are designed so as to not conflict with the services, licences and supply of the Existing Products contained in the 2024 Services Agreement and the 2024 Supply of Goods Agreement, but in the event such a conflict between this Agreement and the 2024 Services Agreement and/or the 2024 Supply of Goods Agreement does arise, this Agreement shall take precedence.

1.3. Without prejudice to the generality of Clause 1.2, the Parties acknowledge and agree that LIV US has possession of the Existing Products supplied to it by the Supplier pursuant to the 2024 Supply of Goods Agreement and accordingly, such Existing Products may be used in the performance of this Agreement. Notwithstanding this, the title to such Existing Products remains with the Supplier as at the Commencement Date pursuant to the terms of that agreement, and LIV US has the discretion to elect such title be transferred to a LIV Golf Affiliate at any time during the term or after the expiry or termination of the 2024 Supply of Goods Agreement. Accordingly, such provision survives the expiry or termination of that agreement such that LIV US may elect for title to those Existing Products to pass to a LIV UK or a LIV Golf Affiliate at any time.

**2. SUPPLIER'S GENERAL OBLIGATIONS**

2.1. The Supplier warrants and undertakes to the LIV Golf Parties on an ongoing basis during the Term that it shall:

2.1.1. use Service Personnel who are suitably skilled, qualified, trained and experienced to perform tasks assigned to them, and in sufficient number to ensure that the Supplier's obligations are fulfilled and maintain discipline and good order amongst Service Personnel;

2.1.2. provide in a timely manner, such information as a LIV Golf Party may require;

2.1.3. meet any agreed performance dates and time for performance (including delivery dates) by the Supplier shall be of the essence of this Agreement;

2.1.4. without prejudice to Clauses 4.3.5 and 5.3.3, comply, and procure that the Service Personnel comply, with all Applicable Laws and all reasonable policies communicated

by a LIV Golf Party from time-to-time, all reasonable instructions given by a LIV Golf Party and its obligations and undertakings set out in this Agreement;

2.1.5. act in good faith towards the LIV Golf Parties and co-operate with the LIV Golf Parties in all matters relating to this Agreement;

2.1.6. obtain, maintain and comply with all licences, authorisations, permissions and permits required to enter into this Agreement and perform its obligations under this Agreement;

2.1.7. conduct its business with due diligence, in an efficient and environmentally responsible manner, adhering fully to the highest standards of sustainability (and to any standards reasonably specified by a LIV Golf Party from time-to-time), and ensuring that all its operations are carried out in accordance therewith;

2.1.8. without prejudice to Clauses 2.1.4 and 2.1.6, maintain in force all necessary environmental licenses under Applicable Laws, and shall comply with and observe all conditions and restrictions contained in or imposed by any such licences;

2.1.9. conduct its business in accordance with the highest ethical standards;

2.1.10. not (and shall use reasonable efforts to procure that its Service Personnel, employees, directors, officers, agents and sub-contractors shall not) make any statement or otherwise conduct itself in a manner that is intended to be (or which it is foreseeable will be) damaging, prejudicial or defamatory to the reputation or image of a LIV Golf Party or the LIV Golf Parties, any LIV Golf Affiliate, the League, an Event or any of the League's commercial partners (who are in the public domain or of whom the Supplier has been notified) or take part in any activities or use any rights granted pursuant to this Agreement in any manner which is or might be derogatory to the reputation of any of the foregoing or which would be inconsistent with Supplier's position as a supplier to the LIV Golf Parties;

2.1.11. use reasonable endeavours to provide any information, support or approvals that are reasonably requested by a LIV Golf Party to assist such LIV Golf Party meeting its environmental and social responsibility targets from time-to-time;

2.1.12. observe all health and safety rules and regulations and any other security requirements and accreditation terms and conditions which have been notified to Supplier; and

2.1.13. be responsible for the management, supervision and payment of the Service Personnel, including all tax liabilities and national insurance obligations, and shall ensure the Supplier is compliant with any Applicable Laws relating to working hours and employee rights in respect of each of the Service Personnel.

2.2. If the Supplier commits an Event of Default (under paragraphs (i) or (ii) of the definition of "Event of Default") in respect of Clauses 4.1 – 4.3, or 5.1 - 5.3, the LIV Golf Parties may (without prejudice to any other rights or remedies it may have):

2.2.1. refuse to accept any subsequent performance of the Services or Supply of Products (as appropriate) which the Supplier attempts to make (and withhold payment in relation to such Services);

2.2.2. purchase substitute services or products (as appropriate) from elsewhere and reclaim from the Supplier any additional costs reasonably incurred as a result of procuring such services or products (as appropriate) from a third party instead of the Supplier;

2.2.3. hold the Supplier accountable for any loss and additional costs incurred. In this regard, the Supplier shall indemnify each of the LIV Golf Parties on demand for any such loss and additional costs; and

2.2.4. receive a refund of all sums previously paid by the LIV Golf Parties to the Supplier which relate to Services that the Supplier has failed to provide or failed to provide in accordance with Clause 4.3 or Products that the Supplier has failed to provide or failed to provide in accordance with Clause 5.3 (as appropriate).

2.3. Each LIV Golf Party's rights under this Agreement are in addition to the statutory terms implied in favour of such LIV Golf Party by the Supply of Goods and Services Act 1982 and any other statute.

**3. THE LIV GOLF PARTIES' OBLIGATIONS**

3.1. The LIV Golf Parties shall use reasonable endeavours to co-operate with the Supplier in matters relating to the Services.

3.2. The LIV Golf Parties shall deliver such of the Hospitality Benefits to the Supplier as the Supplier purchases from time to time in accordance with the Minimum Hospitality Spend set out in Part 1 to this Agreement.

3.3. In consideration of the provision of the Services by the Supplier, the LIV Golf Parties shall pay the Services Fees in accordance with the terms of this Agreement.

3.4. In consideration of the Supply of Products by the Supplier, a LIV Golf Party shall pay the Purchase Amount to the Supplier in accordance with the terms of this Agreement.

**4. SERVICES**

4.1. The Supplier shall provide the Services on the terms set out in this Agreement and so as to meet or exceed the Service Levels.

4.2. The Supplier shall make available Service Personnel to the LIV Golf Parties as are reasonably required to deliver the Services. The Supplier shall procure that the Service Personnel provide the Services to the LIV Golf Parties upon the terms and conditions contained in this Agreement during the Term and be responsible for all acts and omissions of such Service Personnel.

4.3. The Supplier warrants and undertakes to the LIV Golf Parties on an ongoing basis during the Term that, with respect to the provision of the Services, it shall:

4.3.1. perform the Services with reasonable skill and care and in accordance with generally recognised commercial practices and standards in the industry for similar services;

4.3.2. ensure that the Services conform in all respects and at all times with any description for the Services agreed by the Parties and comply with all Applicable Laws;

4.3.3. ensure that the Deliverables are of satisfactory quality;

4.3.4. monitor and report its performance against the Service Levels and in the event of a Service Level Failure, or it is reasonably believed that there may be one, comply with the terms of Annex D;

4.3.5. comply, and procure that the Service Personnel comply, with all reasonable instructions given by a LIV Golf Party concerning the Services;

4.3.6. obtain, maintain and comply with all licences, authorisations, permissions and permits required to enable any use by a LIV Golf Party of the Deliverables;

4.3.7. notify the LIV Golf Parties as soon as it becomes aware of any health and safety hazards or issues which arise in relation to the Services;

4.3.8. ensure at all times that appropriate safety and security systems, policies and procedures are maintained and enforced to prevent unauthorised access or damage to, and to ensure the business continuity of, any and all Services and any related networks or resources in accordance with good industry practice, including an incident management process which shall enable the Supplier (and any of its permitted sub-contractors), as a minimum, to discover and assess incidents (including any vulnerability, virus or security incident which affects or may affect a LIV Golf Party in any way (an "**Incident**")), and to prioritise those Incidents;

4.3.9. notify the LIV Golf Parties immediately if Supplier becomes aware of any Incident and respond without delay to all queries and requests for information from a LIV Golf Party about any Incident, whether discovered by the Supplier or a LIV Golf Party, in particular bearing in mind the extent of any reporting obligations the LIV Golf Parties may have under Applicable Laws including Data Protection Legislation or cybersecurity legislation and that the LIV Golf Parties may be required to comply with statutory or other regulatory timescales;

4.3.10. at the Supplier's cost, promptly cooperate with any request for information made in respect of:

(a) any Incident; or

(b) any requests for information, or inspection, made by a regulator with competent jurisdiction over a LIV Golf Party (including in connection with any Applicable Laws including Data Protection Legislation or cybersecurity legislation);

4.3.11. not introduce any viruses or vulnerabilities onto the network or information systems of a LIV Golf Party or supplier to a LIV Golf Party;

4.3.12. ensure that the Services are secure, materially accurate, complete, and materially error free; and

4.3.13. not do or cause anything to be done, and procure that the Service Personnel shall not do or cause anything to be done, in the performance of the Services within the GCP environment, which, in the reasonable opinion of the LIV Golf Parties, may cause a LIV Golf Party(ies) to be in breach of its contractual and/or licence obligations to Google with respect to the GCP environment.

4.4. The Supplier may not charge for the time it spends assessing or responding to a request from a LIV Golf Party for a change to the Services except with the prior written agreement of a LIV Golf Party.

4.5. The Supplier acknowledges that:

4.5.1. it may be providing the Services for the benefit of any LIV Golf Affiliate; and

4.5.2. any such company is a third party beneficiary which may enforce the terms of this Agreement in accordance with the Contracts (Rights of Third Parties) Act 1999.

4.6. Given that the League is newly formed, it is conceivable that the LIV Golf Parties' requirements may need to be revisited (and therefore the rights and obligations set out hereunder shall have a non-precedential effect on future dealings between the parties). The Parties shall work together in good faith to address any revised requirements.

4.7. This Agreement is entered into by and between:

4.7.1. LIV Golf US and Supplier for the purpose of Services to be provided in connection with Events in the US; and

4.7.2. LIV Golf UK and Supplier for the purpose of services to be provided in connection with Events outside of the US.

4.8. The licences granted by Supplier in this Agreement, including all those licences listed in Part 3 shall be granted on an exclusive basis to the LIV Golf Parties with regards to the exercise of such licences in relation to professional golf competitions and the broadcast (or re-broadcast) of any golf tournament or any other programme regarding golf.

4.9. Supplier warrants, represents and undertakes that the number of Existing Products purchased under the 2024 Supply of Goods Agreement together with those Products purchased under this Agreement and any other supply of goods agreement between the Supplier and the LIV Golf Parties is sufficient for Supplier to provide the Services as described in this Agreement, including the assumptions set out at Annex C, and would enable: (i) up to 72 streams to be provided as part of the Services; and, (ii) an additional 12 streams to be provided for LIV Golf Parties' use on an ad hoc basis during the Term, as requested by a LIV Golf Party.

4.10. EXCEPT FOR THE EXPRESS WARRANTIES SET FORTH IN THIS AGREEMENT, ALL SERVICES ARE PROVIDED "AS IS" AND THE SUPPLIER HEREBY DISCLAIMS ALL CONDITIONS AND WARRANTIES, WHETHER EXPRESS, IMPLIED, STATUTORY, OR OTHERWISE UNDER THIS AGREEMENT, AND THE SUPPLIER SPECIFICALLY DISCLAIMS ALL IMPLIED CONDITIONS AND WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE. WITHOUT LIMITING THE FOREGOING, THE SUPPLIER MAKES NO CONDITION OR WARRANTY OF ANY KIND THAT THE SERVICES, OR ANY PRODUCTS OR RESULTS OF THE USE THEREOF, WILL (a) MEET THE LIV GOLF PARTIES' OR ANY OTHER PERSON'S REQUIREMENTS; (b) OPERATE WITHOUT INTERRUPTION; (c) ACHIEVE ANY INTENDED RESULT; or (d) BE COMPATIBLE OR WORK WITH ANY SOFTWARE, SYSTEM, OR OTHER SERVICES EXCEPT IF AND TO THE EXTENT EXPRESSLY SET FORTH IN ANY TECHNICAL SPECIFICATIONS AGREED BETWEEN LIV GOLF PARTIES AND SUPPLIER (INCLUDING, FOR GREATER CERTAINTY, THAT THE SERVICES SHALL BE COMPATIBLE WITH SERVICES PROVIDED BY VIEWLIFT AND GCP); OR BE SECURE, ACCURATE, COMPLETE, FREE OF HARMFUL CODE, OR ERROR FREE.

**5. SUPPLY OF THE PRODUCTS**

5.1. The Supplier shall:

5.1.1. supply the Products to the LIV Golf Parties; and

5.1.2. upgrade the Existing Products to the latest version of such products (as at the Commencement Date), including by the replacement of parts to the Existing Products and including extra input cards in the Existing Products, within 5 days of the Commencement Date and at no additional cost,

each on the applicable terms set out in this Agreement.

5.2. During the Term, the Supplier shall supply, and the LIV Golf Parties shall purchase, such quantities of Products as the LIV Golf Parties may order under Clause 6 of this Agreement.

5.3. The Supplier warrants and undertakes to the LIV Golf Parties on an ongoing basis during the Term that, with respect to the Supply of Products, it shall:

5.3.1. provide the Products in accordance with Clause 7;

5.3.2. ensure that the Supply of Products conform in all respects and at all times with any description for the Supply of Products agreed by the Parties and comply with all Applicable Laws and are of satisfactory quality;

5.3.3. comply, and procure that the Service Personnel comply, with all reasonable instructions given by a LIV Golf Party concerning the Supply of Products;

5.3.4. obtain, maintain and comply with all consents, licenses and authorities required to enable any use by a LIV Golf Party of the Products; and

5.3.5. notify the LIV Golf Parties as soon as it becomes aware of any health and safety hazards or issues which arise in relation to the Supply of Products.

5.4. The Supplier may not charge for the time it spends assessing or responding to a request from a LIV Golf Party for a change to the Supply of Products except with the prior written agreement of a LIV Golf Party.

5.5. The Supplier acknowledges that it may be providing the Supply of Products for the benefit of any LIV Golf Affiliate; and any such company is a third party beneficiary which may enforce the terms of this Agreement in accordance with the Contracts (Rights of Third Parties) Act 1999.

**6. ORDERS**

6.1. The Supplier shall supply Products in accordance with this Agreement.

6.2. A LIV Golf Party may at any time prior to despatch of the Products amend or cancel an Order by written notice to the Supplier. If a LIV Golf Party amends or cancels an Order, its liability to the Supplier shall be limited to payment to the Supplier of all costs reasonably incurred by the Supplier in fulfilling the Order up until the date of receipt of the notice of amendment or cancellation, except that the LIV Golf Party shall have no liability to the Supplier where the amendment or cancellation results from the Supplier's failure to comply with its obligations under this Agreement.

**7. MANUFACTURE, QUALITY AND PACKING**

7.1. The Supplier shall at all times maintain sufficient manufacturing capacity, stocks of raw materials and packaging, and stocks of Products to enable it to meet the LIV Golf Parties' forecasted requirements to Products as notified to the Supplier in accordance with this Agreement.

7.2. The Supplier shall manufacture, pack and supply the Products in accordance with all generally accepted industry standards and practices that are applicable.

7.3. The Products supplied to the LIV Golf Parties by the Supplier under this Agreement shall:

7.3.1. conform to the description at Annex E;

7.3.2. be of satisfactory quality (within the meaning of the Sale of Goods Act 1979) and fit for any purpose held out by the Supplier or made known to the Supplier by a LIV Golf Party;

7.3.3. be free from defects in design, material and workmanship and remain so for 12 months after Delivery; and

7.3.4. comply with all applicable statutory and regulatory requirements.

7.4. The Supplier shall ensure that the Products are properly packed and secured in such manner as to enable them to reach their destination in good condition.

7.5. The Supplier shall obtain and maintain in force for the Term all licences, permissions, authorisations, consents and permits needed to manufacture and supply the Products in accordance with the terms of this Agreement.

7.6. The Supplier shall comply with all Applicable Laws, enactments, orders, regulations and other instruments relating to the manufacture, packing, packaging, marking, storage, handling, and delivery of the Products.

7.7. The LIV Golf Parties shall have the right to enter the Supplier's premises to:

7.7.1. inspect the manufacturing facilities and the equipment used by the Supplier in the manufacture of the Products; and

7.7.2. inspect and take samples of the raw materials, the packaging and the Products; and

7.7.3. inspect stock levels of Products.

7.8. Inspections carried out pursuant to Clause 7.7 shall be carried out during Business Hours on reasonable notice to the Supplier, provided that, in the event of an emergency, the Supplier shall grant the LIV Golf Parties immediate access to its premises.

7.9. If following an inspection a LIV Golf Party considers that the Products are not or are not likely to be as warranted under Clause 7.3, the LIV Golf Party shall inform the Supplier and the Supplier shall immediately take such action as is necessary to ensure that the Products are or will be as warranted under Clause 7.3. The LIV Golf Parties shall have the right to re-conduct inspections and take further samples after the Supplier has carried out its remedial actions.

**8. DELIVERY**

8.1. The Supplier shall deliver the Products specified in each Order to the Delivery Location by the Delivery Date. The Supplier shall not deliver an Order more than two Business Days in advance of the Delivery Date without the prior written consent of the relevant LIV Golf Party.

8.2. Delivery of an Order shall be complete: on the completion of unloading of the Order at the Delivery Location; or (ii) in accordance with Clause 8.5.1 below.

8.3. The Supplier shall not deliver Orders by instalments except with the prior written consent of a LIV Golf Party. Where Orders are to be delivered by instalments, they may be invoiced and paid for separately. References in this Agreement to Orders shall, where applicable, be read as references to instalments.

8.4. If an Order is not delivered on the specified Delivery Date, then, without limiting any other right or remedy a LIV Golf Party may:

8.4.1. refuse to take any subsequent attempted delivery of the Order;

8.4.2. terminate this Agreement with immediate effect;

8.4.3. obtain substitute products from another supplier and recover from the Supplier any costs and expenses reasonably incurred by a LIV Golf Party in obtaining such substitute products; and

8.4.4. subject to Clause 21, claim damages for any other costs, expenses or losses resulting from the Supplier's failure to deliver the Order on the Delivery Date, provided that the Supplier shall have no liability for any failure or delay in delivering an Order to the extent that such failure or delay is caused by a LIV Golf Party's failure to comply with its obligations under this Agreement.

8.5. If a LIV Golf Party fails to accept delivery of an Order on the specified Delivery Date, then, except where such failure or delay is caused by the Supplier's failure to comply with its obligations under this Agreement or a Force Majeure Event:

8.5.1. the Order shall be deemed to have been delivered at 9.00am (local time) on the Delivery Date; and

8.5.2. the Supplier shall store the Order until delivery takes place, and charge the LIV Golf Party for all related costs and expenses (including insurance).

8.6. Each delivery of Products shall be accompanied by a delivery note from the Supplier showing the date of the Order, the type and quantity of Products included in the Order, including the code numbers of the Products, and, in the case of Products being delivered by instalments, the outstanding balance of Products specified in an Order remaining to be delivered.

8.7. If the Supplier requires a LIV Golf Party to return any packaging materials to the Supplier, that fact must be clearly stated on the delivery note accompanying the relevant Order, and any such returns shall be at the Supplier's expense.

**9. ACCEPTANCE AND DEFECTIVE PRODUCTS**

9.1. A LIV Golf Party shall not be deemed to have accepted any Products until it has had a reasonable time to inspect them following Delivery, which, to the extent Delivery has taken place prior to the Commencement Date per the ‘Delivery Details’ in Annex E, shall be deemed to be a reasonable time following the Commencement Date (such inspection to take place no later than February 6th, 2025), or, in the case of a latent defect in the Products, until a reasonable time after the latent defect has become apparent.

9.2. If any Products delivered to a LIV Golf Party do not comply with Clause 7.3, or are otherwise not in conformity with the terms of this Agreement, then, without limiting any other right or remedy that the LIV Golf Party may have, the LIV Golf Party may reject those Products and:

9.2.1. require the Supplier to repair or replace the rejected Products at the Supplier's risk and expense within five Business Days of being requested to do so; or

9.2.2. require the Supplier to repay the price of the rejected Products in full, whether or not the LIV Golf Party has previously required the Supplier to repair or replace the rejected Products; and

9.2.3. claim damages for any other costs, expenses or losses resulting from the Supplier's delivery of Products that do not conform with the terms of this Agreement.

9.3. A LIV Golf Party's rights and remedies under this Clause 9 are in addition to the rights and remedies available to it in respect of the statutory conditions relating to description, quality, fitness for purpose and correspondence with sample implied into this Agreement by the Sale of Goods Act 1979.

9.4. The terms of this Agreement shall apply to any repaired or replacement Products supplied by the Supplier.

9.5. If the Supplier fails to promptly repair or replace rejected Products in accordance with Clause 9.2.1, a LIV Golf Party may, without affecting its rights under Clause 9.2.3, obtain substitute products from a third party supplier, or have the rejected Products repaired by a third party, and the Supplier shall reimburse the LIV Golf Party for the costs it incurs in doing so.

**10. TITLE AND RISK**

10.1. The risk in Products delivered to a LIV Golf Party shall pass to a LIV US on Delivery.

10.2. Subject to Clauses 10.3 and 10.4, title to Products delivered to LIV US shall remain with the Supplier.

10.3. LIV US may elect (at its sole discretion), at any point during the Term or after expiry or termination of this Agreement that any title to the Products shall be transferred to either LIV Golf

Party or a LIV Golf Affiliate. In such circumstances, the Supplier will comply with any reasonable request of LIV US to transfer the title.

10.4. The Supplier shall not, without the prior written consent of LIV US (which a LIV Golf Party may grant or withhold in its absolute discretion), part with control of (including for the purposes of repair or maintenance), sell or offer for sale, underlet or lend any Product or allow the creation of any mortgage, charge, lien or other security interest in respect of any Product.

## 11. INTELLECTUAL PROPERTY

11.1. The Parties shall retain ownership of any pre-existing Intellectual Property. Subject to Clause 11.5, as between the Supplier and the LIV Golf Parties, all Intellectual Property created in the course of: (a) the Services (including in the Deliverables); and (b) developing the Products which is specific to the Supply of Products provided in accordance with the terms of this Agreement, and with respect to both (a) and (b) which subsists now or at any time in the future, shall be jointly owned by the LIV Golf Parties. Supplier hereby waives any "moral" or other rights of authorship which may accrue or have accrued to Supplier under any laws of any jurisdiction. To the extent that any Intellectual Property created in the course of the Services and/or the development or Supply of Products vests in the Supplier, the Supplier assigns (by way of assignment of present and future rights) without payment all such Intellectual Property to the LIV Golf Parties with full title guarantee. If the Supplier is unable to assign such Intellectual Property (because the laws in another country differ from English law and do not permit such assignment), the Supplier shall immediately on request execute all documents and perform all acts (and procure that each of the Service Personnel and any third party as necessary perform all acts) that may be necessary to effect the transaction that most closely resembles the commercial intent of an assignment and is permitted in the relevant territory. Pending the above assignments and remaining formalities relating to such assignments, the Supplier shall hold all such Intellectual Property on trust for the LIV Golf Parties.

11.2. Without limitation to Clause 11.1, all rights in the League and the right to exploit the League are the property of and are expressly reserved by the LIV Golf Parties.

11.3. The Supplier warrants to the LIV Golf Parties that the provision of the Services, use of the Deliverables or the Intellectual Property rights in the Deliverables by the LIV Golf Parties will not infringe the rights of any third party.

11.4. The Supplier shall not acquire any right, title or interest in or to any Intellectual Property owned or licensed by any third party to a LIV Golf Party by reason of this Agreement and the Supplier acknowledges that all such Intellectual Property shall (as between the Parties) remain the property of the LIV Golf Parties.

11.5. The Supplier and its licensors are, and shall remain, the sole and exclusive owners of all right, title, and interest in and to the Pre-Existing Materials, including all improvements made thereto during the Term of this Agreement, including all Intellectual Property Rights therein. All other rights in and to the Pre-Existing Materials are expressly reserved by Supplier. For the avoidance of doubt, this shall not give Supplier any rights in relation to content created in the course of this Agreement.

## 12. INSURANCE

12.1. The Supplier shall procure and at all times maintain insurance policies in effect and issued by a reputable international insurer (with an “A-“ rating or better according to the latest edition of S&P/AM. Best’s Key Rating Guide) as are appropriate and adequate, insuring the Supplier and its sub-contractors, agents and such other persons involved in the provision of the Services in respect of all risks which are customary for services that are the same or substantially the same

as the Services, that a prudent supplier of equivalent services would have in place, and which are reasonably acceptable to the LIV Golf Parties, including:

12.1.1. risks normally covered by policies of public liability, general liability and employers' liability;

12.1.2. risks normally covered by policies of accident insurance and medical insurance;

12.1.3. acts of terrorism;

12.1.4. product liability;

12.1.5. insurance of the Products to a value not less than its full replacement value comprehensively assessed against all usual risks of loss, damage or destruction by fire, theft or accident; and

12.1.6. any damage to property at or in the vicinity of the Venue.

12.2. Notwithstanding the generality of the foregoing, the Supplier must ensure, as a minimum that the following cover is procured:

12.2.1. public liability insurance of at least $5,000,000 (five million US Dollars) for claims arising from a single event or series of related events in a single calendar year;

12.2.2. product liability insurance of at least $5,000,000 (five million USD) for claims arising from a single event or series of related events in a single calendar year;

12.2.3. professional indemnity insurance with a limit of at least $15,000,000 (fifteen million US Dollars) for claims arising from a single event or series of related events in a single calendar year;

12.2.4. cyber crime and tech errors & omissions insurance of at least $10,000,000 (ten million USD) for claims arising from a single event or series of related events in a single calendar year; and

12.2.5. insurance which would cover any loss or damage to any Product until the later of: (i) the time that the risk in such Product transfers to a LIV Golf Party in accordance with clause 8.1; and (ii) the time when such Products ceases to be within the control of the Supplier,

with the policies set out under this Clause 12.2 and Clause 12.1 being the "**Insurance Policies**".

12.3. Solely to the extent this Agreement relates to a matter where Trump National Golf Club Bedminster, Trump National Doral Miami or any other Trump Organisation owned course will be used as a Venue, Supplier shall itself provide, and shall be responsible for ensuring that each of its subcontractors also provide, a certificate of insurance showing policies, coverage, limits and other terms and conditions: (i) as per the pro forma certificates of insurance attached hereto as Annex A(a) and (b), in respect of Events at Bedminster and Miami, (ii) that are materially in accordance with the pro forma certificate of insurance attached hereto at Annex A(a) in respect of Events at any other Trump Organisation owned course; or (iii) in accordance with any other pro forma certificate of insurance provided in writing by a LIV Golf Party in relation to any Trump Organisation owned course (and this shall take precedence over (i) and (ii)), and naming the following as additional insureds or any other person as notified by the LIV Golf Parties:

12.3.1. in respect of Trump National Golf Club Bedminster: Lamington Farm Club, LLC, LFB Acquisition LLC, LFB Acquisition Member Corp, DJT Holdings, LLC, DJT Holdings Managing Member LLC, Donald J. Trump, The Donald J. Trump Revocable Trust

dated April 7, 2014, The Trump Corporation, The Trump Organization, and each of their respective trustees, directors, managers, officers, employees, servants, agents, and representatives, and any and all related companies;

12.3.2. in respect of Trump National Doral Miami: Trump Endeavor 12 LLC, Trump Endeavor 12 Manager Corp, Endeavor 22 LLC, Trump Miami Resort Management LLC, Trump Miami Resort Management Member Corp, DJT Holdings, LLC, DJT Holdings Managing Member LLC, Donald J. Trump, The Donald J. Trump Revocable Trust dated April 7, 2014, The Trump Corporation, The Trump Organization, and each of their respective trustees, directors, managers, officers, employees, servants, agents, and representatives, and any and all related companies; and

12.3.3. in respect of Trump National Golf Club Washington DC: Trump National Golf Club Washington DC LLC, Trump National Golf Club Washington DC Member Corp, DJT Holdings LLC, DJT Holdings Managing Member LLC, Donald J. Trump, The Donald J. Trump Revocable Trust dated April 7, 2014, and each of their respective trustees, directors, managers, officers, employees, servants, agents, and representatives, and any and all related companies.

12.4. All such Insurance Policies shall (i) include a waiver of subrogation rights in favour of the LIV Golf Parties and the other LIV Golf Indemnitees (or, if such waiver is unobtainable or unenforceable, (a) an express agreement that such policy shall not be invalidated if the insured waives the right of recovery against any party responsible for a loss covered by the policy before the loss, or (b) any other form of permission for the release of any LIV Golf Party or any LIV Golf Indemnitee), (ii) be primary and non-contributory to all other coverage that any LIV Golf Party and the other LIV Golf Indemnitees may have or obtain, (iii) not provide for any deductibles in excess of fifty thousand ($50,000); and (iv) be written on an occurrence basis; and (v) name the LIV Golf Parties and each LIV Golf Affiliate as specified by the LIV Golf Parties to the Supplier as additional insureds (save that the LIV Golf Parties and each LIV Golf Affiliate shall not be named as additional insureds on any policy relating to professional indemnity insurance or professional liability insurance, and directors' and officers' insurance and workers' compensation (to the extent applicable)).

12.5. The Supplier represents that, as at the date of this Agreement, there are no known losses under the Insurance Policies which would result in the amount which could be recovered (by Supplier or a LIV Golf Party or any LIV Golf Affiliate named as an additional insured on such policy) being less than the amounts set out in Clause 12.2.

12.6. Upon request, the Supplier shall furnish the LIV Golf Parties with certificates of insurance for the insurance required hereby certifying that such coverages are in full force and effect for the period of the Term and that all premiums due up to and including the date of the certificate have been paid for. Such certificate must provide for 30 days of notice to each LIV Golf Party in the event of a material change or cancellation of such coverage within 10 days in the event of non-payment of a premium.

12.7. The provisions of this Clause 12 shall extend to any substituted or remedial services provided by the Supplier.

## 13. PRODUCT PRICES

13.1. The Product Prices for the Term shall be the prices set out in Annex F.

13.2. The Product Prices are inclusive of amounts in respect of VAT. A LIV Golf Party shall, on receipt of a valid VAT invoice from the Supplier, pay to the Supplier such additional amounts in respect of VAT as are chargeable on a supply of Products.

13.3. The Product Prices are inclusive of the costs of packaging, insurance and carriage of the Products, subject to paragraph 4.1.2 of Annex E in respect of any costs of carriage.

13.4. The LIV Golf Parties shall be entitled to the Supplier's standard discount for prompt payment.

13.5. Volume discounts shall be calculated by reference to the Product Prices in force on the first day of the year (or part year), which shall for the purposes of calculating the discounts be inclusive of any VAT (if applicable) and exclusive of any incidental costs payable in respect of the Products.

13.6. After the end of each year, the Supplier shall submit a statement to the LIV Golf Parties showing the quantities of Products purchased during that year and any volume discount that is due ("**Discount Statement**"). Unless a LIV Golf Party disputes the Discount Statement, the Supplier shall pay the volume discount to the LIV Golf Parties in cleared funds to the bank account nominated in writing by a LIV Golf Party.

13.7. The Supplier shall use all reasonable endeavours during the Term to reduce its manufacturing, supply and other costs for the Products, including implementing cost savings initiatives and seeking more competitive supplies of raw materials and equipment. The net benefit of cost reductions shall be applied to reduce the Product Prices with immediate effect.

13.8. The Supplier agrees that if at any time during the Term it sells any Product to a comparable customer for less than the Product Price then in force for that Product, it shall reduce the relevant Product Price to match the lower price for so long as the lower price is available (but for no longer) and shall refund the LIV Golf Parties the difference between the Product Price and the lower price in respect of its purchases of the Product after the Supplier began charging the lower price. For the purposes of this clause, "comparable" means a customer that purchases products in substantially similar volumes as the LIV Golf Parties on broadly similar terms and conditions.

**14. FEES**

14.1. In consideration of the provision of the Services, the LIV Golf Parties shall pay to the Supplier the Services Fees in accordance with the Services Payment Schedule. Unless specified in the definition of "Services Fees" at Part 1, a LIV Golf Party shall be under no obligation to reimburse to the Supplier costs and expenses incurred by the Supplier in the performance of the Services.

14.2. In consideration of the provision of the Products, the LIV Golf Parties shall pay to the Supplier the Purchase Amount in accordance with the Products Payment Schedule, subject to LIV Golf Parties' receipt of a valid invoice.

14.3. The LIV Golf Parties shall have absolute discretion as to whether any invoice(s) pursuant to this Agreement are addressed to either LIV Golf Party or any LIV Golf Affiliate(s) and the LIV Golf Parties may elect to split any such amounts between any LIV Golf Party and any LIV Golf Affiliate(s) and require the Supplier to issue an invoice separately for such amounts.

14.4. Save where there is a different instruction provided by the LIV Golf Parties under Clause 14.1, Supplier shall apportion the Services Fees to: (a) LIV US, in respect of Services to be provided in connection with Events in the US; and (b) LIV UK, in respect of Services to be provided in connection with Events outside of the US. For the avoidance of doubt, the Services Fees shall only be payable once (as apportioned between LIV US and LIV UK, as set out in the previous sentence). A separate invoice shall be issued to LIV US and LIV UK. Supplier shall provide at least 10 days' advance notice of the proposed apportionment of any Services Fees between LIV US and LIV UK and such invoice may not be issued until such apportionment is agreed by a LIV Golf Party (such approval not to be unreasonably withheld or delayed).

14.5. Unless otherwise expressly set out in this Agreement:

14.5.1. all Services Fees and any other amounts due to Supplier with respect to the provision of the Services pursuant to this Agreement are expressed exclusive of VAT or equivalent taxes; and

14.5.2. the Purchase Amount and any other amounts due to the Supplier with respect to the provision of the Products pursuant to this Agreement are expressed inclusive of all taxes, withholdings and deductions.

14.6. Unless otherwise specified in the definition of the "Services Payment Schedule" at Part 1, the Services Fees and any reimbursable costs and expenses shall be invoiced monthly in arrears. Invoices for agreed expenses shall be payable only if accompanied by a detailed breakdown of the expenses and relevant receipts and such expenses have been approved in advance in writing, and, in addition, any travel and meal expenses having been incurred in line with a LIV Golf Party's travel and expenses policy provided from time-to-time which, for the avoidance of doubt, states that LIV Golf Parties would only cover the cost of economy class flights for vendor personnel (regardless of position held). The LIV Golf Parties shall, at their cost, be responsible for arranging accommodation for a KAM at an Event. Supplier shall have no right to receiving accommodation expenses for KAM or any other person from Supplier who attends an Event.

14.7. Payment of invoices in relation to which there is no bona fide dispute shall be made in full by the due date set out in the Services Payment Schedule or Products Payment Schedule as appropriate, subject to the LIV Golf Parties having received a valid invoice not less than thirty (30) days prior to the applicable payment date and where an invoice is not received by such date the time for payment shall be extended to thirty days after receipt of the invoice. The previous sentence is subject to any express provisions set out in the Services Payment Schedule or Products Payment Schedule as appropriate regarding earlier payment of invoices in relation to which there is no bona fide dispute. Payment of invoices in relation to which there is a bona fide dispute shall be made within thirty (30) days of settlement of the dispute. The time for payment of the Services Fees shall be of the essence of this Agreement.

14.8. All payments shall be made by a LIV Golf Party in US Dollars by transfer to such bank account as the Supplier may from time to time notify in writing to the LIV Golf Parties.

14.9. If payment of an invoice is not made by the due date, the Supplier shall, without prejudice to any other rights or remedies, have the right to charge the respective LIV Golf Party interest (both before and after any judgment) on the amount unpaid, at the rate of two per cent (2%) per annum above the Bank of England's base rate from time to time, until payment.

14.10. A LIV Golf Party may from time to time set off any liability of the Supplier that is due and outstanding to a LIV Golf Party either under this Agreement or the Supply of Goods Agreement against any payment or other liability of the respective LIV Golf Party to the Supplier (the "**LIV Golf Liability**"), whether such LIV Golf Liability is present or future, liquidated or unliquidated, and whether or not the LIV Golf Liability arises under this Agreement. If the liabilities to be set off are expressed in different currencies, a LIV Golf Party may convert either liability at a market rate of exchange for the purpose of set-off. Any exercise by a LIV Golf Party of its rights under this Clause shall not limit or affect any other rights or remedies available to it under this Agreement or otherwise.

14.11. Where Services are provided on a time and materials basis:

14.11.1. all materials shall be supplied at cost;

14.11.2. the Supplier's standard daily fee rates for each person are calculated on the basis of that person having worked a full eight-hour shift (less any statutory breaks),

irrespective of whether such shift is completed and whether it is on a weekday, public holiday or otherwise;

14.11.3. the Supplier shall not be entitled to charge on a pro-rata basis for part-days worked by the Supplier's personnel unless it has a LIV Golf Party's prior written consent to do so;

14.11.4. the Supplier shall ensure that the Supplier's personnel complete time sheets recording time spent on the Services, and, subject to the written approval of them by a LIV Golf Party, the Supplier shall use such time sheets to calculate the charges covered by each monthly invoice;

14.11.5. each invoice shall set out the time spent by each of the Supplier's personnel and be accompanied by timesheets; and

14.11.6. the Supplier shall maintain complete and accurate records of the time spent and materials used by the Supplier in providing the Services in such form as a LIV Golf Party shall approve. The Supplier shall allow each LIV Golf Party and its agents to inspect and take copies of such records at all reasonable times on request.

14.12. For the avoidance of doubt, there will be no annual inflation / cost of living fee adjustment to the Services Fees.

**15. SUPPLIER RECORDS**

15.1. The Supplier shall provide all such evidence as a LIV Golf Party may reasonably require in order to verify:

15.1.1. invoices submitted by the Supplier; and

15.1.2. cost reductions achieved by the Supplier (including the dates on which cost reductions were achieved).

15.2. Without prejudice to the generality of Clause 15.1, during the Term of this Agreement and for at least three years following the expiration or earlier termination of this Agreement, the Supplier will maintain complete and accurate accounting and business records necessary to verify all Services performed and Products supplied, and the amounts invoiced to LIV Golf Parties and time worked by the Supplier and Service Personnel in performing the Services, including, but not limited to, fees paid and incurred, and hours worked in connection with the Services provided to LIV Golf Parties under this Agreement. Such records will be in accordance with standard accounting practices. Each LIV Golf Party will have the right, at its own expense, to inspect and audit (using its internal auditors or its independent third party auditors that are approved by the Supplier, such approval not to be unreasonably withheld) such records at the Supplier's place of business during normal Business Hours at a mutually acceptable time during the Term and for a period of three years thereafter. Each LIV Golf Party agrees to give the Supplier at least 30 days' prior written notice of its intent to inspect Supplier's records. Except in the event of an actual material breach by the Supplier of this Agreement, a LIV Golf Party may not exercise this inspection right more than once each calendar year. As a condition of such audit, the respective LIV Golf Party shall ensure that it, and its representatives (including any third party auditors) will keep the Supplier's Confidential Information in confidence in accordance with the terms of this Agreement and shall not disclose any Confidential Information obtained through the audit to a third party (other than to the LIV Golf Parties' representatives) without the express written consent of the Supplier. In the event a LIV Golf Party performs such audit or inspection and non-compliance or an overcharge to a LIV Golf Party is discovered, the Supplier will, as promptly as possible, remedy such non-compliance or reimburse such LIV Golf Party for such overcharge. If the overcharge equals or exceeds five percent (5%) of the total Services Fees billed with

respect to the Services, or five percent (5%) of the Purchase Amount with respect to the Products, the Supplier will also, as promptly as reasonably possible, reimburse the LIV Golf Party for its audit costs, up to a maximum cost of fifty thousand US Dollars ($50,000).

**16. OTHER ACTIVITIES**

16.1. During the Term of this Agreement and for a period of three months thereafter, the Supplier shall not and shall procure that any Service Personnel shall not:

16.1.1. directly or indirectly, solicit or recruit any person who was, at any time during the previous three months, an employee of a LIV Golf Party or a LIV Golf Affiliate (provided, however, that the foregoing provision shall not prohibit solicitations made to the general public); or

16.1.2. directly or indirectly solicit or encourage any supplier, licensee, licensor, lender, landlord or other business relation of a LIV Golf Party and/or any LIV Golf Affiliate to terminate or diminish its relationship with them.

**17. NON DISPARAGEMENT**

17.1. During the Term, the Supplier shall not, and shall procure that the Service Personnel, its directors and executives and the directors and executives of its Affiliates do not, make any statement or otherwise conduct themselves in a manner that is intended to be (or which it is foreseeable will be) damaging, prejudicial or defamatory to the reputation or image of an Event, the League, the LIV Golf Parties, any LIV Golf Affiliate, any person(s) that has Control over a LIV Golf Party or any of the League's or an Event's commercial partners (of whom are in the public domain or who the Supplier has been notified of) or take part in any activities or use any rights granted pursuant to this Agreement in any manner which is or is reasonably likely to be derogatory to the reputation of any of the foregoing or which would be inconsistent with Supplier's position as a supplier to the LIV Golf Parties. Notwithstanding the foregoing, the Supplier's obligation under this Clause 17.1 with respect to the League's or an Event's commercial partners (of whom are in the public domain or who the Supplier has been notified of) shall apply only during the Term of this Agreement and shall not continue thereafter.

17.2. During the Term, the LIV Golf Parties shall not and shall procure that its directors and executives and the directors and executives of its Affiliates do not make any statement or otherwise conduct themselves in a manner that is intended to be (or which it is foreseeable will be) damaging, prejudicial or defamatory to the reputation or image of the Supplier or any Affiliate of the Supplier or take part in any activities or use any rights granted pursuant to this Agreement in any manner which is or is reasonably likely to be derogatory to the reputation of any of the foregoing.

**18. FORCE MAJEURE AND COVID-19 PROVISIONS**

18.1. A Party shall not be in breach of this Agreement if performance of any of its obligations under this Agreement is prevented (in full or in part) or delayed due to any Force Majeure Event, provided that the relevant affected Party shall:

18.1.1. promptly upon the occurrence of any such cause or event inform the other Party in writing, stating that such cause has delayed or prevented its performance; and

18.1.2. take all reasonable steps to comply with the terms of this Agreement as fully and promptly as possible.

18.2. If the Force Majeure Event continues beyond 14 days, the Party whose performance was not prevented or delayed by the Force Majeure Event may terminate this Agreement on seven days' written notice to the other Party.

18.3. Any consequential or indirect loss or damage whatsoever sustained by either Party in connection with such Force Majeure Event shall be at such Party's own risk and shall be borne by it.

18.4. For the duration of a Force Majeure Event which affects either LIV Golf Party's ability to benefit from the Services as intended under this Agreement (the "**Affected Period**"), the LIV Golf Parties shall not be required to pay the Services Fees and the amount due shall be reduced on a pro rata basis by reference to the length of the Affected Period as a proportion of the Term. On request, Supplier shall repay any amounts previously paid by the LIV Golf Parties on account of the Affected Period. This right shall be without prejudice to the LIV Golf Parties other rights.

18.5. The Supplier shall at all times comply with the Covid-19 policy of a LIV Golf Party, as may be updated and communicated to the Supplier from time-to-time by a LIV Golf Party, which may include, at a LIV Golf Party's discretion, an obligation for any Service Personnel required at a Venue to be vaccinated unless medically exempt.

**19. TERMINATION AND RENEGOTIATION**

19.1. Either Party may terminate this Agreement with immediate effect by notice to the other Party and without any liability to that Party on or at any time after the occurrence of any Event of Default by the other Party.

19.2. Without affecting any other right or remedy available to it, a LIV Golf Party may at any time on written notice terminate this Agreement with immediate effect if:

19.2.1. Control of the Supplier is transferred to any person or persons other than the person or persons in Control of the Supplier at the date of this Agreement;

19.2.2. the Supplier, any Service Personnel or any Supplier Affiliate, director, officer, executive or representative is convicted of any criminal offence (other than an offence under any road traffic legislation for which a fine or non-custodial penalty is imposed) or are guilty of any fraud or commit any unlawful act of discrimination or is proved to have been dishonest in relation to the provision of the Services;

19.2.3. the Supplier is in breach of Clause 23 ('Anti-Bribery, Anti-Corruption and Anti-Tax Evasion') of this Agreement, including if Supplier has failed to procure that any Service Personnel has complied with a provision of Clause 14 of this Agreement; or

19.2.4. the Supplier is in breach of Clause 24 ('Sanctions') of this Agreement or any Sanctions prevent Supplier from performing, or prevent a LIV Golf Party from accepting the Supplier's performance of, its obligations under this Agreement.

19.3. A LIV Golf Party may terminate this Agreement:

19.3.1. on not less than 90 days' written notice to the Supplier in the event that a LIV Golf Party or a LIV Golf Affiliate appoints as an official sponsor or partner a third party whose business activities include the provision of goods and/or services which are the same as (or materially similar to) those provided by the Supplier (whether under this Agreement or otherwise) and subject to the LIV Golf Parties paying the Supplier (subject to receipt of a valid invoice) an amount equivalent to 50% of the Services Fees payable in respect of the period after termination (less any amount of the

Services Fees which would have been paid to third parties which the Supplier is not contractually obliged to pay to such third parties); or

19.3.2. either in respect of a specific Event or in its entirety by giving reasonable written notice to the Supplier if, for any reason, an Event is postponed or cancelled. If a LIV Golf Party terminates this Agreement either in respect of a specific Event or in its entirety in accordance with this Clause 19.3.2 the LIV Golf Parties' sole liability to the Supplier in connection with such termination shall be to reimburse the Supplier for all pre-approved reasonable costs actually incurred by the Supplier either in respect of a specific Event or in its entirety (as applicable) which the Supplier has incurred in accordance with the terms of this Agreement prior to the date of such termination, and proof of such costs having been incurred being provided to the LIV Golf Parties. The Parties shall negotiate in good faith any additional compensation to be paid by the LIV Golf Parties in respect of other costs, and time expenditures of the Supplier incurred in their performance of this Agreement having taken account of any fees and costs already received by the Supplier. For the avoidance of doubt, where an Event is postponed, the Supplier shall provide the Services at or in respect of the Event on the rescheduled dates.

19.4. Termination of this Agreement for any reason, whether under this Clause 19 or not, shall be without prejudice to the accrued rights and liabilities of the Parties on the date of termination.

19.5. Upon the expiry or termination of this Agreement for any reason:

19.5.1. the Supplier shall not use or exploit its previous connection as supplier of the Services to the LIV Golf Parties, unless a LIV Golf Party has approved any such use in writing;

19.5.2. the Supplier shall immediately deliver to the LIV Golf Parties all Deliverables whether or not then complete;

19.5.3. the Supplier shall return to the LIV Golf Parties any property of the LIV Golf Parties in the Supplier's possession;

19.5.4. the Supplier shall return to the LIV Golf Parties any original or copy documents obtained by the Supplier in the course of providing the Services;

19.5.5. the Supplier shall, if so requested by the LIV Golf Parties, provide all assistance reasonably required by the LIV Golf Parties to facilitate the smooth transition of the Services to the LIV Golf Parties or any replacement supplier appointed by them. In the absence of agreement, the LIV Golf Parties shall pay for any such assistance at the Supplier's standard time and material rates;

19.5.6. unless otherwise expressly set out in this Agreement, upon termination of this Agreement a LIV Golf Party shall not be liable to make any further payment to the Supplier (other than in respect of any accrued Services Fees or expenses as at the date of termination) and no further fees shall be payable in respect of any period after termination, with the exception of any fees for assistance with the transition of the Services in accordance with Clause 19.5.5;

19.5.7. to the extent a LIV Golf Party has paid any fees in advance regarding Services which have not been delivered, such fees shall be repaid to the relevant LIV Golf Party; and

19.5.8. all licenses granted from the Supplier to the LIV Golf Parties under this Agreement shall automatically terminate and the LIV Golf Parties shall cease all use of the

materials and Services subject to such licenses, unless otherwise specified in this Agreement.

19.6. A LIV Golf Party may also exercise the rights at Clauses 19.5.3 and 19.5.4 at any time on request, and not solely on expiry or termination of this Agreement.

19.7. Without affecting any other right or remedy available to either Party, the LIV Golf Parties and the Supplier shall enter into good faith negotiations in respect of the terms of this Agreement (including, but not limited to, the amount of the Fee), but shall be under no obligation to amend the terms of this Agreement in such instance, if:

19.7.1. the commercial value of the League, or the brand, image or reputation of an Event, the League, a LIV Golf Party or any LIV Golf Affiliate, is or could be substantially impaired, in the reasonable opinion of a LIV Golf Party, by the commission of any act (including the failure to act and including any historic acts or omissions which become known to the public after the start of the Term) by the Supplier, or any of its directors, executives, Service Personnel which: (i) shocks or offends the community; (ii) violates public morals and decency; or (iii) otherwise results in damage to an Event's, the League's, a LIV Golf Party's or any LIV Golf Affiliate's commercial value, brand, image or reputation; and/or

19.7.2. there is any material change in the structure or status of the League or the golfing calendar which adversely affects, in a LIV Golf Party's reasonable opinion, the value of the League.

19.8. The LIV Golf Parties and the Supplier have agreed the terms and conditions which shall apply in relation to Transferring Employees in Part 5 and all Parties shall comply with the provisions of that Part 5.

19.9. For the avoidance of doubt, if one LIV Golf Party terminates this Agreement, this Agreement shall be terminated and shall not continue between the other LIV Golf Party and Supplier.

**20. INDEMNITY**

20.1. The Supplier shall indemnify and hold each LIV Golf Party, each LIV Golf Affiliate, and any person(s) that has Control over the LIV Golf Parties, and each of their directors, officers, employees, agents, representatives, successors and assigns (each a "**LIV Golf Indemnitee**" and collectively the "**LIV Golf Indemnitees**"), harmless from all liabilities, claims, costs, proceedings, damages and expenses (including legal and other professional fees and expenses) awarded against, or incurred or paid by, a LIV Golf Indemnitee as a result of or in connection with:

20.1.1. any breach of the warranties set out at Clause 4.3;

20.1.2. any failure of the Supplier to comply with the provisions of Clause 23 ('Anti-Bribery, Anti-Corruption and Anti-Tax Evasion'), Clause 24 ('Sanctions') and Clause 25 ('Data Protection');

20.1.3. any alleged or actual infringement, whether or not under English law, of any third party's Intellectual Property or other rights relating to or arising out of the use of anything created in the course of providing Services; or

20.1.4. any claim made against a LIV Golf Indemnitee by any third party (including any fine by any government authority) to the extent that the respective liability, loss, damage,

injury, cost or expense was caused by, relates to or arises from the provision of the Services as a consequence of a breach or negligent performance or failure or delay in performance of this Agreement by the Supplier.

**21. LIMITATION OF LIABILITY CLAUSE AND WAIVER OF LIENS**

21.1. Nothing in this Agreement shall exclude or limit the liability of either Party:

21.1.1. for death or personal injury caused by its negligence;

21.1.2. for fraud or fraudulent misrepresentation;

21.1.3. for any liability that cannot be excluded by law;

21.1.4. in respect of a breach of Clause 22 (‘Confidentiality’), subject to Clause 21.3; or

21.1.5. for any breach of Part 5 (TUPE) (including the indemnities therein).

21.2. Except where Clause 21.1, Clause 21.4 or Clause 21.7 applies, the aggregate liability of: (i) the LIV Golf Parties in respect of any loss or damage suffered by the Supplier; and (ii) the Supplier in respect of any loss or damage suffered by the LIV Golf Parties, arising out of or in connection with this Agreement, whether in contract, tort (including negligence) or for breach of statutory duty or in any other way with respect to all claims arising under or in connection with this Agreement shall not exceed the aggregate amount of the Services Fees and Purchase Amount owed or paid (the “**Aggregate Cap**”).

21.3. Except where Clauses 21.1.1, 21.1.2 or 21.1.3 apply, neither the LIV Golf Parties nor the Supplier shall be liable, in contract, tort (including negligence) or for breach of statutory duty or in any other way for any indirect loss.

21.4. Nothing in this Agreement shall exclude or limit the liability of the Supplier arising under the indemnities given by the Supplier at Clauses 20.1.2 and 20.1.3 under this Agreement or in respect of any deliberate breach or wilful default.

21.5. In respect of the Events held at Washington DC, Bedminster and any other Trump Organisation owned course, Supplier agrees that it shall not place any lien or other similar instrument on the land of any Venue or any improvements, machinery, equipment, goods or other personal property on the land of any Venue, and that it waives and releases, and by signing this Agreement shall be conclusively deemed to have waived and released, any and all rights to lien, liens and claims of liens upon any of the foregoing described property and any rights regarding any labour or material bond regarding the said property, even if it has not actually received payment.

21.6. The Parties agree that the Parties cannot make any double recovery of any Losses under this Agreement and: (i) the 2024 Services Agreement; or (ii) the 2024 Supply of Goods Agreement. For the purpose of this Clause 21.5, “Losses” shall mean claims, demands, actions, awards, judgments, settlements, costs, expenses, liabilities, damages and losses (including all interest, fines, penalties, management time and legal and other professional costs and expenses).

21.7. The liability of the Supplier shall not be limited by Clause 21.2 to the extent that any such amount is recovered under insurance policies which the Supplier is obligated to hold pursuant to this Agreement. The Supplier shall use commercially reasonable endeavours to recover any such amount under such insurance policies.

**22. CONFIDENTIALITY**

22.1. Each Party undertakes that it shall not at any time disclose to any person any confidential information concerning the business, affairs, customers, clients or suppliers of the other Party ("**Confidential Information**"), except as permitted by Clauses 22.2 or 22.3.

22.2. Each Party may disclose the other Party's Confidential Information:

22.2.1. to its employees, officers, representatives or advisers who need to know such information for the purposes of exercising the Party's rights or carrying out its obligations under or in connection with this Agreement. Each Party shall ensure that its employees, officers, representatives or advisers to whom it discloses the other Party's Confidential Information comply with this Clause 22; or

22.2.2. as may be required by law, a court of competent jurisdiction or any governmental or regulatory authority.

22.3. The LIV Golf Parties may disclose the Confidential Information of the Supplier to:

22.3.1. any LIV Golf Affiliate;

22.3.2. any current or prospective equity holder of a LIV Golf Party or the League;

22.3.3. any of the LIV Golf Teams participating in the League (and the current or prospective equity holders in such LIV Golf Teams and the representatives of such LIV Golf Teams); and

22.3.4. an alternative operator of the League,

(each a "**Disclosee**") provided in each instance that such Disclosee is under confidentiality obligations no less stringent than those contained in this Clause 22. The LIV Golf Parties shall be jointly and severally liable for any breach of the confidentiality obligations by any Disclosee.

22.4. No Party shall use any other Party's Confidential Information for any purpose other than to exercise its rights or perform its obligations under in connection with this Agreement.

22.5. The Supplier agrees to keep all of the terms of this Agreement confidential and further agrees not to make or release statements to the press or other media or make any other public announcement which refer to: (i) the League; (ii) an Event; or (iii) the conclusion of terms of or any dispute arising under this Agreement, unless such statements are approved in advance in writing by a LIV Golf Party prior to release.

22.6. Notwithstanding the generality of the foregoing, the Supplier acknowledges and agrees that it would be materially detrimental to the LIV Golf Parties if the Service Personnel were to disclose to owners, licensees and/or operators of other events with whom the Supplier may do business, those ideas, formats, plans, content, and other proprietary and commercially sensitive information which have been or are being developed by or for a LIV Golf Party. Each LIV Golf Party reserves all of its rights in such circumstances.

## 23. ANTI-BRIBERY, ANTI-CORRUPTION AND ANTI-TAX EVASION

23.1. The Supplier represents and warrants that it is familiar with the UK Bribery Act 2010 and the US and Foreign Corrupt Practices Act of 1977, and other applicable laws or regulations of similar substance ("**Anti-Bribery Laws**"), and represents, warrants and covenants that it and its Affiliates are now and will remain in compliance with all applicable Anti-Bribery Laws.

23.2. The Supplier represents, warrants and covenants that it has or will promptly communicate the obligations and prohibitions set out in this Clause 23 to any present and future Affiliates,

directors, officers, employees, and any other Service Personnel acting on behalf of Supplier in connection with this Agreement and shall ensure that all such entities and individuals operate consistently with the terms hereof.

23.3. Without prejudice to the Supplier's obligations to comply with Applicable Law under Clause 2.1.4, the Supplier shall, and shall procure that the Service Personnel shall, during the Term of this Agreement:

23.3.1. comply with all applicable laws, statutes, regulations, and codes relating to anti-bribery and anti-corruption (the "**Relevant Anti-Bribery Requirements**"), including but not limited to the Anti-Bribery Laws;

23.3.2. not engage in any activity, practice or conduct which would constitute an offence under sections 1, 2 or 6 of the Bribery Act 2010 if such activity, practice or conduct had been carried out in the UK;

23.3.3. comply with all applicable laws and regulations relating to anti-facilitation of tax evasion (the "**Relevant Anti-Tax Evasion Requirements**"), including the Criminal Finances Act 2017;

23.3.4. not engage in any activity, practice or conduct which would constitute either:

(a) a UK tax evasion facilitation offence under section 45(5) of the Criminal Finances Act 2017; or

(b) a foreign tax evasion facilitation offence under section 46(6) of the Criminal Finances Act 2017,

23.3.5. comply with the policies provided by a LIV Golf Party to the Supplier from time to time, in each case as a LIV Golf Party may update them from time to time (the "**Relevant Policies**");

23.3.6. not do, or omit to do, any act that will cause or lead a LIV Golf Party or a LIV Golf Affiliate to be in breach of any of the Relevant Anti-Bribery Requirements, the Relevant Anti-Tax Evasion Requirements or Relevant Policies;

23.3.7. notify the LIV Golf Parties (in writing) if it becomes aware of any breach of Clauses 23.1, 23.3.1, 23.3.2, 23.3.3, 23.3.4(a), 23.3.4(b), 23.3.6 or has reason to believe that it or any Service Personnel has received:

(a) a request or demand for any undue financial or other advantage; or

(b) a request or demand from a third party to facilitate the evasion of tax within the meaning of Part 3 of the Criminal Finances Act 2017 in connection with the performance of this Agreement,

23.3.8. establish, maintain and enforce policies and procedures, including but not limited to adequate procedures under the Bribery Act 2010 and the Criminal Finances Act 2017, to ensure compliance with the Relevant Anti-Bribery Requirements, the Relevant Anti-Tax Evasion Requirements and the Relevant Policies;

23.3.9. if requested, provide a LIV Golf Party with any reasonable assistance, at the respective LIV Golf Party's reasonable cost, to enable such LIV Golf Party to perform any activity required by any relevant government or agency in any relevant jurisdiction for the purpose of compliance with any of the Relevant Anti-Bribery Requirements, the Relevant Anti-Tax Evasion Requirements or Relevant Policies; and

23.3.10. within one month of the date of this Agreement, and annually thereafter during the Term, certify to LIV Golf Parties in writing signed by an officer of the Supplier compliance with this Clause 23 by the Supplier and the Service Personnel. The Supplier shall also provide such supporting evidence of compliance as LIV Golf Parties may reasonably request.

23.4. The Supplier, without limiting the generality of the foregoing, further covenants that neither its present or future Affiliates nor any of their respective officers, directors, investors, employees, contractors, senior managers, partners, owners, principals or any agent acting on its behalf will, in connection with the rights granted, obligations established and/or any activities addressed under this Agreement, directly or indirectly, offer, gift, promise or otherwise transfer or authorize the transfer of anything of tangible or intangible value, including but not limited to cash, checks, wire transfers, gifts, favours, services, and entertainment and travel expenses, to any Government Official (as defined below) or any immediate family member of any Government Official for the purpose of (a) obtaining, retaining or directing business, (b) influencing any act, decision or failure to act by a Government Official in his or her official capacity, (c) inducing a Government Official to use his or her influence with a Government Authority to affect any act or decision of such Government Authority, or (d) securing an improper advantage.

23.5. The Supplier hereby confirms that as of the date of signature of this Agreement there is no pending, threatened or past investigation, litigation, conviction, actions or proceeding pursuant to compliance with any applicable Anti-Bribery Laws, Relevant Anti-Bribery Requirements or Relevant Anti-Tax Evasion Requirements involving the Supplier, its shareholders, directors, employees or any Service Personnel, before any court, tribunal or governmental body agency or authority.

23.6. The Supplier shall immediately notify LIV Golf Parties in the event that there are any actions or proceedings made or threatened against the Supplier or any of its shareholders, directors or employees or any Service Personnel, before any court, tribunal or governmental body agency or authority in respect of any non-compliance with Anti-Bribery Laws, Relevant Anti-Bribery Requirements or Relevant Anti-Tax Evasion Requirements or should it learn or have reason to know of any violation or suspected violation of applicable obligations pursuant to Anti-Bribery Laws, Relevant Anti-Bribery Requirements or Relevant Anti-Tax Evasion Requirements established and/or any activities addressed under this Agreement.

23.7. Upon request by a LIV Golf Party, the Supplier agrees to provide timely certification of compliance with the representations and warranties set out in this Clause 23.

23.8. The following terms shall have the meaning as set out below for the purpose of this Clause 23:

23.8.1. "**Government Official**" shall mean (a) any executive, official, employee or agent of a governmental department, agency or instrumentality, (b) a director, officer, employee, or agent of a wholly or partially government-owned or –controlled company or business, (c) a political party or one of its officials, (d) a candidate for public office, and (e) an executive, official, employee or agent of a public international organization (e.g., the International Monetary Fund or the World Bank); and

23.8.2. "**Government Authority**" shall mean any foreign, domestic, federal, territorial, state or local governmental authority of any nature (including any government and any governmental agency, instrumentality, court, tribunal or commission, or any subdivision, department or branch of any of the foregoing) or body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police,

regulatory or taxing authority or power of any nature as well as any public international organization.

**24. SANCTIONS**

The Supplier hereby confirms that neither it nor its Affiliates or Service Personnel is: (i) a person or entity; or (ii) controlled by a person or entity, who is subject to any financial sanctions or other restrictive measures ("**Sanctions**") maintained by any agency or department of any national government, regional body, multilateral institution or other body which is responsible for the adoption, implementation or enforcement of sanctions laws (including but not limited to the United Nations Security Council, the Council of the European Union, the European Commission, the relevant competent authorities of individual European Union member states, the United States Department of the Treasury's Office of Foreign Assets Control, the United States Department of Commerce and the United Kingdom's HM Treasury and United Kingdom's Department for International Trade).

**25. DATA PROTECTION**

25.1. The Parties shall comply with all applicable requirements under Data Protection Legislation. This Clause 25 is in addition to, and does not relieve, remove or replace, a party's obligations or rights under the Data Protection Legislation.

25.2. For the purposes of this Clause 25:

25.2.1. the terms "**Commissioner**", "**controller**", "**data subject**", "**personal data**", "**personal data breach**", "**processor**" and "**processing**", shall have the meaning given to them in the UK GDPR;

25.2.2. "**LIV Golf Personal Data**" means any personal data which the Supplier processes in connection with this Agreement, in the capacity of a processor on behalf of a LIV Golf Party; and

25.2.3. "**Supplier Personal Data**" means any personal data which the Supplier processes in connection with this Agreement, in the capacity of a controller.

25.3. This Clause 25.3 applies where the Supplier acts as a controller. Without prejudice to Clause 16.1, the Supplier:

25.3.1. shall process all Supplier Personal Data strictly in accordance with the then current version of Supplier's privacy policy available on Supplier's website;

25.3.2. undertakes, warrants and represents that the Supplier's privacy policy, and any amendments, will at all times comply with Data Protection Legislation and that it will not make any amendments to the Supplier privacy policy where this would be in contravention of Data Protection Legislation;

25.3.3. as between the parties, is solely responsible for ensuring that the processing of Supplier Personal Data complies with Applicable Laws, including Data Protection Legislation, and in particular, that all required fair processing information is provided to the relevant data subjects; and

25.3.4. agrees that if there are any inconsistencies or conflicts between the terms of the Supplier privacy policy and this Agreement, this Agreement shall take precedence.

25.4. This Clause 25.4 applies where the Supplier acts as a processor.

25.4.1. In relation to LIV Golf Personal Data, the scope, nature and purpose of processing by the Supplier, the duration of the processing and the types of personal data and categories of data subject are as set out below:

(a) scope: the performance of the Services;

(b) nature: processing personal data of personnel involved in the Services for the provision of the Services;

(c) purpose of processing: the processing of the personal data is necessary for the Supplier's performance of the Services, and more particularly, the support services only;

(d) duration of the processing: for no longer than is required in order to provide the Services and comply with the provisions of this Agreement;

(e) types of personal data: names and such other personal data as may be disclosed to the Supplier in relation to the Services; and

(f) categories of data subject: personnel involved in the Services. The Parties have confirmed that such personnel shall not include personal data of the golfers or associated parties at the Events.

25.4.2. Without prejudice to Clause 25.1, the Supplier shall, in relation to LIV Golf Personal Data:

(a) process that personal data only on the documented written instructions of a LIV Golf Party, unless the Supplier is required by Applicable Laws to otherwise process that LIV Golf Personal Data. Where the Supplier is relying on Applicable Laws as the basis for processing LIV Golf Personal Data, the Supplier shall promptly notify the LIV Golf Parties of this before performing the processing required by the Applicable Laws unless those Applicable Laws prohibit the Supplier from so notifying the LIV Golf Parties on important grounds of public interest. The Supplier shall immediately inform the LIV Golf Parties if, in the opinion of the Supplier, the instructions of a LIV Golf Party infringe Data Protection Legislation;

(b) without prejudice to Clause 4.3.8, implement appropriate technical and organisational measures to protect against unauthorised or unlawful processing of LIV Golf Personal Data and against its accidental loss, damage or destruction, including as appropriate:

(i) the pseudonymisation and encryption of LIV Golf Personal Data;
(ii) the ability to ensure the ongoing confidentiality, integrity, availability and resilience of processing systems and services;
(iii) the ability to restore the availability and access to LIV Golf Personal Data in a timely manner in the event of a physical or technical incident; and
(iv) a process for regularly testing, assessing and evaluating the effectiveness of technical and organisational measures for ensuring the security of the processing,

(c) ensure and procure that all personnel who have access to and/or process personal data are obliged to keep the personal data confidential;

(d) promptly assist the LIV Golf Parties, in responding to any request from a data subject and in ensuring compliance with the LIV Golf Parties' obligations under Data Protection Legislation with respect to security, breach notifications, impact assessments and consultations with the Commissioner, supervisory authorities or other regulators and, in particular, the Supplier shall promptly notify the LIV Golf Parties if it receives any complaint, notice or communication (whether from the Commissioner, any data subject, supervisory authority or other third party) which relates to processing of LIV Golf Personal Data;

(e) notify the LIV Golf Parties without undue delay (and in any event no later than 36 hours) after becoming aware of a personal data breach;

(f) at the written direction of a LIV Golf Party, delete or return to the LIV Golf Parties all LIV Golf Personal Data on termination or expiry of the Agreement, and certify to the LIV Golf Parties in writing it has done so, unless the Supplier is required by Applicable Law to continue to process that LIV Golf Personal Data, in which case the Supplier shall promptly notify the LIV Golf Parties, in writing, of what that Applicable Law is and shall only be permitted to process that LIV Golf Personal Data for the specific purpose so-notified, and all other requirements set out in this Clause 25 shall continue to apply to such LIV Golf Personal Data notwithstanding the termination or expiry of this Agreement for as long as such LIV Golf Personal Data is processed by the Supplier. For the purposes of this Clause (f) the obligation to "delete" data includes the obligation to delete data from back-up systems as well as live systems; and

(g) maintain adequate records, and, on a LIV Golf Party's request, make available such information as LIV Golf may reasonably request, and allow for and submit its premises and operations to audits, including inspections, by a LIV Golf Party or a LIV Golf Party's designated auditor, to demonstrate its compliance with Data Protection Legislation and this Clause 25.

25.4.3. The Supplier shall not, without the prior written consent of a LIV Golf Party (and in any event subject to the Supplier providing the LIV Golf Party with reasonable evidence that such activity is being undertaken in full compliance with Data Protection Legislation) appoint or replace (or change the terms of the appointment of) any other processor in relation to LIV Golf Personal Data or transfer any LIV Golf Personal Data to the same.

25.5. The Parties have identified that an International Transfer which is subject to the EU GDPR and/or UK GDPR takes place under this Agreement. Such International Transfer shall be permitted between the Parties provided that:

25.5.1. such transfer is not a Restricted Transfer at any time; or

25.5.2. the Parties are bound by, or its relevant sub-processor(s) has entered into, the Transfer Clauses in accordance with this Agreement.

25.6. For the purposes of permitting an International Transfer as set out in Clause 25.5 above, the following terms shall apply:

25.6.1. the relevant Transfer Clauses shall apply as set out in Clause 25.7 below (and shall be deemed incorporated into this Clause) where the LIV Golf Parties are based in the UK and outside the EEA and transfers personal data to the Supplier based in a territory which has not been the subject of a finding of an Adequacy Decision; and

25.6.2. the relevant annexures to the Transfer Clauses applicable between the Parties shall be deemed populated in accordance with the information set out herein.

25.7. Where the Data Exporter is the controller of personal data to be exported and the Data Importer is to be a processor in respect of that personal data then that Data Exporter and Data Importer shall comply with the C-to-P Transfer Clauses and UK IDTA (where applicable).

25.8. If so required by the laws or regulatory procedures of any jurisdiction, the Parties shall execute or re-execute the Transfer Clauses as separate documents setting out the proposed transfers of personal data in such manner as may be required but shall for the purposes set out herein shall be deemed a separate agreement between each relevant Party. In the event that the Transfer Clauses are amended, replaced, made available in alternative form or repealed by the European Commission, UK Secretary of State or other body having competent authority and jurisdiction over such Clauses, a Party (on its own behalf and acting as agent for each applicable Party) shall be entitled to update or replace the Transfer Clauses and the Parties shall work to take such steps as may be reasonably required to enter into and be bound by a new set of Transfer Clauses (and this Agreement may be varied or modified accordingly as set out in Clause 28.9).

25.9. Each Party shall perform its obligations under this Clause 25 at its own cost.

## 26. MODERN SLAVERY

In performing its obligations under this Agreement, the Supplier shall (a) comply with all applicable anti-slavery and human trafficking laws, statutes and regulations from time to time in force (anti-slavery laws) including, but not limited to, the UK Modern Slavery Act 2015, and (b) include in contracts with its subcontractors anti-slavery and human trafficking provisions that are at least as onerous as those set out in this Clause. The Supplier represents and warrants that it has not been convicted of any offence involving slavery and human trafficking or been the subject of any investigation, inquiry or enforcement proceedings regarding any offence or alleged offence of or in connection with slavery and human trafficking.

## 27. NOTICES

27.1. Any notice given to a Party under or in connection with this Agreement shall be in writing in English and shall be:

27.1.1. delivered by hand or by registered mail service to the address at the top of this Agreement or such other address as is notified by a Party for the purposes of this Clause 27, with a copy also sent by email in accordance with Clause 27.1.2; or

27.1.2. sent by email to:

(a) a LIV Golf Party: legalnotices@livgolf.com for the attention of the General Counsel; and

(b) the Supplier: legal@mobii.com

27.2. Any notice shall be deemed to have been received:

27.2.1. if delivered by hand, at the time of delivery;

27.2.2. if sent by registered mail service, seven days after the date of posting; and

27.2.3. if sent by email, at 9.00 am on the next Business Day after transmission.

## 28. GENERAL

28.1. This Agreement constitutes the entire agreement and understanding between the Parties with respect to the subject matter of this Agreement, and supersedes and extinguishes any prior drafts, agreements, undertakings, understandings, promises or conditions, whether oral or written, express or implied between the Parties relating to such subject matter.

28.2. Without prejudice to Clause 1.2, to the extent there is any conflict between this Agreement, the 2024 Services Agreement and the 2024 Supply of Goods Agreement, this Agreement shall take precedence.

28.3. Each Party acknowledges to the other that it has not been induced to enter into this Agreement by nor has it relied upon any representation, promise, assurance, warranty or undertaking (whether in writing or not) by or on behalf of the other party or any other person save for those contained in this Agreement. Accordingly, each of the Parties acknowledges and agrees that the only remedy available to it in respect of the subject matter of this Agreement shall be for breach of contract under the terms of this Agreement. Nothing in this Agreement shall exclude liability for fraud or fraudulent misrepresentation.

28.4. The Supplier shall notify LIV Golf Parties in writing immediately in the event of the occurrence of any Event of Default.

28.5. The Supplier may not:

28.5.1. assign, novate, charge, sub-license, transfer or create any trust in respect of, or purport to assign, transfer or create any trust in respect of, a right or obligation under this Agreement; or

28.5.2. subcontract the performance of any of its obligations under this Agreement,

without having first obtained each LIV Golf Party's written consent, which each LIV Golf Party may grant or withhold in its absolute discretion.

28.6. Where a LIV Golf Party gives its consent to subcontract under Clause 28.5.2 to a person or where the Supplier contracts with a person (for example an Event supplier) as part of the Services, the Supplier agrees that it shall remain responsible for its obligations under the Agreement performed by any such person to the same extent as if such obligations were performed by the Supplier, and shall procure compliance by the person with the Supplier's obligations under this Agreement.

28.7. Subject to Clause 28.8, a LIV Golf Party may not:

28.7.1. assign, novate, charge, sub-license, transfer or create any trust in respect of, or purport to assign, transfer or create any trust in respect of, a right or obligation under this Agreement; or

28.7.2. subcontract the performance of any of its obligations under this Agreement,

without having first obtained the Supplier's written consent, not to be unreasonably withheld or delayed.

28.8. Each LIV Golf Party shall be entitled, in its sole discretion, to assign, novate, charge, sub-license, sub-contract and/or otherwise transfer the benefit and/or burden of this Agreement or any of its rights and/or obligations under this Agreement to a LIV Golf Affiliate or alternative operator of the League (for which no consent will be required).

28.9. A variation of this Agreement is valid only if it is in writing and signed by each Party.

28.10. A failure to exercise or delay in exercising a right or remedy provided by this Agreement or by law does not constitute a waiver of the right or remedy or a waiver of other rights or remedies. No single or partial exercise of a right or remedy provided by this Agreement or by law prevents further exercise of the right or remedy or the exercise of another right or remedy.

28.11. In any action by the Supplier for breach of any provision of this Agreement, the Supplier agrees that its exclusive remedy shall be an action at law for damages. In no event shall the Supplier be entitled to obtain injunctive or any other equitable relief against a LIV Golf Party.

28.12. Except as otherwise specifically provided herein, the rights and remedies contained in this Agreement are cumulative and not exclusive of rights or remedies provided by law.

28.13. If any provision of this Agreement is or becomes illegal, invalid or unenforceable, in any respect: (a) it shall not affect or impair the legality, validity or enforceability of any other provision of this Agreement; and (b) the Parties will negotiate in good faith with a view to replacing it with a valid and enforceable provision which achieves to the greatest extent possible the same effect as would have been achieved by the illegal, invalid or unenforceable provision but differing from the replaced provision as little as possible.

28.14. Except with respect to any indemnity given by the Supplier under this Agreement, and any LIV Golf Affiliate for which Supplier is supplying Services in accordance with Clause 4.5.2, a person who is not a party to this Agreement has no right under the Contracts (Rights of Third Parties) Act 1999 to enforce any term of this Agreement but this does not affect any right or remedy of a third party which exists or is available apart from that Act.

28.15. Each Party shall at its own expense take all reasonably necessary steps and co-operate fully with the other party to ensure that it obtains the full benefit of this Agreement and shall execute such documents and take such other steps (or procure other necessary persons to take such steps) as are reasonably necessary or appropriate for vesting in the other party all its rights and interests in this Agreement and the full benefit of this Agreement.

28.16. No provision of this Agreement creates a partnership between the Parties or, unless otherwise specifically provided for herein, makes a Party the agent of the other Party for any purpose. A party has no authority or power to bind, to contract in the name of, or to create a liability for the other party in any way or for any purpose.

28.17. Notwithstanding any provision of this Agreement to the contrary, the provisions of Clauses 16, 17, 19.5, 20, 21, 22, 23.3, and 27 and all of Part 5 and any other Clauses which expressly or impliedly survive expiry or termination of this Agreement for any reason whatsoever shall continue in full force and effect after expiry or termination.

28.18. This Agreement may be executed (including via electronic means) in counterparts, which together shall constitute one agreement. Either Party may enter into this Agreement by executing a counterpart and this Agreement shall not take effect until it has been executed by both Parties.

28.19. Save for the governing law and jurisdiction expressly set out in the Transfer Clauses, this Agreement and any dispute, claim or controversy arising out of or relating hereto shall be governed by and construed and interpreted in accordance with the laws of England and Wales, and the Parties hereby submit to the non-exclusive jurisdiction of the courts of England.

28.20. The Supplier irrevocably appoints Mobii Systems UK Ltd of 20-22 Wenlock Road, London, N1 7GU as its agent to receive on its behalf in England service of any legal proceedings to settle

any dispute or claim arising out of or in connection with this agreement or its subject matter or formation. Such service shall be deemed completed on delivery to such agent (whether or not it is forwarded to and received by the Supplier) and shall be valid until such time as a LIV Golf Party has received prior written notice that such agent has ceased to act as agent. If for any reason such agent ceases to be able to act as agent or no longer has an address in England, the Supplier shall forthwith appoint a substitute acceptable to the LIV Golf Parties and deliver to LIV Golf Parties the new agent's name and address within England.

**PART 5**

**TUPE PROVISIONS**

**1. TUPE**

1.1. Within 20 days of the earliest of:

1.1.1. receipt by the Supplier of a notification from a LIV Golf Party of a Service Transfer or intended Service Transfer;

1.1.2. receipt by the Supplier of a notice of early termination of this Agreement (or any part thereof) from a LIV Golf Party; or

1.1.3. the date 3 months before the scheduled expiry of this Agreement,

and in such an event, at any time on request (and subject to applicable Data Protection Legislation), the Supplier shall provide the Supplier's Provisional Staff List and the Staffing Information to a LIV Golf Party (or, at the direction of a LIV Golf Party, to a Replacement Supplier) and it shall provide an updated Provisional Staff List when reasonably requested by a LIV Golf Party or any Replacement Supplier.

1.2. At least 14 days before any Service Transfer, the Supplier shall prepare and provide to LIV Golf Parties, and/or, at the direction of a LIV Golf Party, to a Replacement Supplier, the Supplier's Final Staff List which the Supplier warrants shall be complete and accurate in all material respects. The Supplier's Final Staff List shall identify which of the Relevant Personnel are Transferring Employees.

1.3. A LIV Golf Party shall be permitted to use and disclose the Supplier's Provisional Staff List, the Supplier's Final Staff List and Staffing Information for informing any tenderer or other prospective Replacement Supplier for any services which are substantially the same type of services (or any part thereof) as the Services.

1.4. The Supplier shall be responsible for the discharge of all salaries, bonuses, benefits and other emoluments and outgoings tax and National Insurance payments and contributions to pension schemes relating to any Relevant Personnel up to and including the date of any Service Transfer and all necessary apportionments shall be made.

1.5. From the date of the earliest event referred to in Clause 1.1 of this Part 5, the Supplier agrees that it shall not, without the prior written consent of a LIV Golf Party, assign any person to the provision of the Services (or the relevant part) which is subject of a Service Transfer or intended Service Transfer who is not listed in the Supplier Provisional Staff List and shall not without the prior written consent of a LIV Golf Party:

1.5.1. increase the total number of employees listed on the Supplier Provisional Staff List (save for the purposes of fulfilling assignments and projects previously scheduled and agreed between the LIV Golf Parties and the Supplier);

1.5.2. make, propose, or permit any changes to the terms and conditions of employment of any employees listed on the Supplier Provisional Staff List;

1.5.3. increase the proportion of working time spent on the Services (or the relevant part) by any of the Relevant Personnel (save for the purposes of fulfilling assignments and projects previously scheduled and agreed with a LIV Golf Party);

1.5.4. introduce any new contractual or customary practice concerning the making of any lump sum payment on the termination of employment of any employees listed on the Supplier Provisional Staff List; and

1.5.5. replace any of the Relevant Personnel listed on the Supplier Provisional Staff List or deploy any other person to perform the Services (or the relevant part) or increase the number of employees or terminate or give notice to terminate the employment or contracts of any person on the Supplier Provisional Staff List.

1.6. The Supplier shall promptly notify LIV Golf Parties, or at the direction of a LIV Golf Party, a Replacement Supplier, of any notice to terminate employment received from any person listed on the Supplier Provisional Staff List, regardless of when such notice takes effect.

1.7. In connection with a Service Transfer to which the Transfer Regulations apply, the Parties agree that:

1.7.1. the Supplier shall perform and discharge all its obligations in respect of all the Transferring Personnel and their representatives, including but not limited to its obligations under the Transfer Regulations, for its own account, up to and including the date of any Service Transfer; and

1.7.2. the Supplier shall indemnify and keep indemnified each LIV Golf Party, each LIV Golf Affiliate and any Replacement Supplier in full for and against all claims, costs, expenses or liabilities whatsoever and howsoever arising, incurred or suffered by each LIV Golf Party, any LIV Golf Affiliate or any Replacement Supplier including without limitation all legal expenses and other professional fees (together with any VAT thereon) in relation to:

(a) the Supplier's failure to perform and discharge any obligation as set out in Clause 1.7.1 of this Part 5;

(b) any act or omission by the Supplier on or before the date of any Service Transfer or any other matter, event, liability or circumstance relating to or occurring at any time before the date of any Service Transfer;

(c) all and any claims in respect of all emoluments, outgoings and/or the provision of any benefit, term or condition, in relation to the Transferring Employees payable or arising on or before the date of any Service Transfer;

(d) any claim made by or in respect of any person employed or formerly employed by the Supplier other than the Transferring Employees for which it is alleged a LIV Golf Party, a LIV Golf Affiliate, or any Replacement Supplier may be liable by virtue of this Agreement and/or the Transfer Regulations; and

(e) any act or omission of the Supplier in relation to its obligations under the Transfer Regulations.

1.8. The Supplier shall indemnify each LIV Golf Party, each LIV Golf Affiliate and any Replacement Supplier in respect of any claims arising from any act or omission of the Supplier in relation to any other Relevant Personnel who is not a Transferring Employee during any period whether before, on or after the date of any Service Transfer.

1.9. The Parties agree that the Contracts (Rights of Third Parties) Act 1999 shall apply to this Agreement to the extent necessary to ensure that any LIV Golf Affiliate and/or Replacement Supplier shall have the right to enforce the obligations owed to, and indemnities given to, any

LIV Golf Affiliate and/or Replacement Supplier by the Supplier, in its own right pursuant to section 1(1) of the Contracts (Rights of Third Parties) Act 1999.

1.10. For the purpose of this Part 5, the Parties agree that the following definitions shall apply:

**"Final Staff List"** means a list of the Relevant Personnel at the date of any Service Transfer;

**"Provisional Staff List"** means a list prepared and updated by the Supplier of all the Relevant Personnel as at the date of preparation of the list;

**"Relevant Personnel"** means those personnel employed or engaged in or wholly or mainly assigned to the provision of the Services or any part of the Services from time to time;

**"Replacement Supplier"** means any person appointed by a LIV Golf Party to provide, either wholly or partly, services to a LIV Golf Party or LIV Golf Parties which are identical or similar to any of the Services;

**"Service Transfer"** means the transfer of the Services (or any part of the Services), for whatever reason from the Supplier to a LIV Golf Party or any Replacement Supplier;

**"Staffing Information"** means, in relation to all persons on the Provisional Staff List, in anonymised format:

- their ages, dates of commencement of employment or engagement and gender;
- details of whether they are employees, workers, self-employed, contractors, consultants, agency workers or otherwise;
- the identity of their employer or relevant contracting party;
- their relevant notice periods and any other terms relating to the termination of employment, including redundancy terms;
- their current wage, salaries, profit sharing, and bonus arrangements;
- details of other employment related benefits;
- any outstanding or potential contractual, statutory or other liabilities;
- details of any long-term sickness absence, maternity or other family friendly leave, or any other absence from work; and
- copies of all relevant documents and materials.

**"Transfer Regulations"** means the Transfer of Undertakings (Protection of Employment) Regulations 2006; and

**"Transferring Employees"** those employees whose contract of employment will be transferred to a LIV Golf Party or a Replacement Supplier pursuant to the Transfer Regulations upon a Service Transfer.

## Annex A

### a) Trump National Golf Club Bedminster

ACORD®

**CERTIFICATE OF LIABILITY INSURANCE**

DATE (MM/DD/YYYY)

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| | |
|---|---|
| PRODUCER | CONTACT NAME: |
| | PHONE (A/C, No, Ext): FAX (A/C, No): |
| | E-MAIL ADDRESS: |
| | INSURER(S) AFFORDING COVERAGE — NAIC # |
| | INSURER A: A Rated Insurer from AM Best |
| INSURED | INSURER B: |
| Contractor/Vendor/Supplier | INSURER C: |
| | INSURER D: |
| | INSURER E: |
| | INSURER F: |

COVERAGES CERTIFICATE NUMBER: REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSR | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| | GENERAL LIABILITY<br>[X] COMMERCIAL GENERAL LIABILITY<br>[ ] CLAIMS-MADE [X] OCCUR<br>Liquor Law($1MM + $10 excess)<br>comp/op + 3 yrs post event<br>GEN'L AGGREGATE LIMIT APPLIES PER: [ ] POLICY [ ] PRO-JECT [X] LOC | X | X | | | | EACH OCCURRENCE | $ 1,000,000 |
| | | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ |
| | | | | | | | MED EXP (Any one person) | $ 1,000,000 |
| | | | | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | | | | | | | GENERAL AGGREGATE | $ 2,000,000 |
| | | | | | | | PRODUCTS - COMP/OP AGG | $ 1,000,000 |
| | | | | | | | contractual liability | $ 1,000,000 |
| | AUTOMOBILE LIABILITY<br>[X] ANY AUTO<br>[ ] ALL OWNED AUTOS [ ] SCHEDULED AUTOS<br>[ ] HIRED AUTOS [ ] NON-OWNED AUTOS | X | X | | | | COMBINED SINGLE LIMIT (Ea accident) | $ 1,000,000 |
| | | | | | | | BODILY INJURY (Per person) | $ 1,000,000 |
| | | | | | | | BODILY INJURY (Per accident) | $ 1,000,000 |
| | | | | | | | PROPERTY DAMAGE (Per accident) | $ 1,000,000 |
| | | | | | | | | $ |
| | [X] UMBRELLA LIAB [X] OCCUR<br>[ ] EXCESS LIAB [ ] CLAIMS-MADE<br>DED RETENTION $ | X | X | follows form | | | EACH OCCURRENCE | $ 10,000,000 |
| | | | | | | | AGGREGATE | $ 10,000,000 |
| | | | | | | | | $ |
| | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY Y/N<br>ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? [ ]<br>(Mandatory in NH)<br>If yes, describe under DESCRIPTION OF OPERATIONS below | N/A | X | | | | WC STATU-TORY LIMITS / OTH-ER | statutory |
| | | | | | | | E.L. EACH ACCIDENT | $ 100,000 |
| | | | | | | | E.L. DISEASE - EA EMPLOYEE | $ 100,000 |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ 500,000 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (Attach ACORD 101, Additional Remarks Schedule, if more space is required)

All policies name the following as additional insureds: Trump Endeavor 12 LLC, Trump Endeavor 12 Manager Corp, Endeavor 22 LLC, Trump Miami Resort Management LLC, Trump Miami Resort Management Member Corp, DJT Holdings, LLC, DJT Holdings Managing Member LLC, Donald J. Trump, The Donald J. Trump Revocable Trust dated April 7, 2014, The Trump Corporation, The Trump Organization, and each of their respective trustees, directors, managers, officers, employees, servants, agents, and representatives, and any and all related companies. Policies (other than WC and EPL) apply on primary non-contributory basis irrespective of any other insurance whether collectible or not. Insurer shall provide thirty (30) days advance written notice of cancellation, non-renewal or coverage reduction to additional insureds. Cont. on Acord 101 attached.

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| Trump Endeavor 12 LLC d/b/a Trump National Doral<br>4400 N.W. 87th Avenue<br>Miami, Florida 33178 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS.<br><br>AUTHORIZED REPRESENTATIVE |

ACORD 25 (2010/05)

© 1988-2010 ACORD CORPORATION. All rights reserved.
The ACORD name and logo are registered marks of ACORD

**b) Trump National Doral Miami**

ACORD

# CERTIFICATE OF LIABILITY INSURANCE

DATE (MM/DD/YYYY)

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: | |
|---|---|---|
| | PHONE (A/C, No, Ext): | FAX (A/C, No): |
| | E-MAIL ADDRESS: | |
| | INSURER(S) AFFORDING COVERAGE | NAIC # |
| | INSURER A: A Rated Insurer from AM Best | |
| INSURED Contractor/Vendor/Supplier | INSURER B: | |
| | INSURER C: | |
| | INSURER D: | |
| | INSURER E: | |
| | INSURER F: | |

COVERAGES CERTIFICATE NUMBER: REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSR | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| | GENERAL LIABILITY<br>[X] COMMERCIAL GENERAL LIABILITY<br>[ ] CLAIMS-MADE [X] OCCUR<br>Liquor Law($1MM + $10 excess)<br>comp/op + 3 yrs post event<br>GEN'L AGGREGATE LIMIT APPLIES PER: [ ] POLICY [ ] PRO-JECT [X] LOC | X | X | | | | EACH OCCURRENCE | $ 1,000,000 |
| | | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ |
| | | | | | | | MED EXP (Any one person) | $ 1,000,000 |
| | | | | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | | | | | | | GENERAL AGGREGATE | $ 2,000,000 |
| | | | | | | | PRODUCTS - COMP/OP AGG | $ 1,000,000 |
| | | | | | | | contractual liability | $ 1,000,000 |
| | AUTOMOBILE LIABILITY<br>[X] ANY AUTO<br>[ ] ALL OWNED AUTOS [ ] SCHEDULED AUTOS<br>[ ] HIRED AUTOS [ ] NON-OWNED AUTOS | X | X | | | | COMBINED SINGLE LIMIT (Ea accident) | $ 1,000,000 |
| | | | | | | | BODILY INJURY (Per person) | $ 1,000,000 |
| | | | | | | | BODILY INJURY (Per accident) | $ 1,000,000 |
| | | | | | | | PROPERTY DAMAGE (Per accident) | $ 1,000,000 |
| | | | | | | | | $ |
| | [X] UMBRELLA LIAB [X] OCCUR<br>[ ] EXCESS LIAB [ ] CLAIMS-MADE<br>DED RETENTION $ | X | X | follows form | | | EACH OCCURRENCE | $ 10,000,000 |
| | | | | | | | AGGREGATE | $ 10,000,000 |
| | | | | | | | | $ |
| | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY Y/N<br>ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? [ ]<br>(Mandatory in NH)<br>If yes, describe under DESCRIPTION OF OPERATIONS below | N/A | X | | | | WC STATU-TORY LIMITS / OTH-ER | statutory |
| | | | | | | | E.L. EACH ACCIDENT | $ 100,000 |
| | | | | | | | E.L. DISEASE - EA EMPLOYEE | $ 100,000 |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ 500,000 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (Attach ACORD 101, Additional Remarks Schedule, if more space is required)

All policies name the following as additional insureds: Trump Endeavor 12 LLC, Trump Endeavor 12 Manager Corp, Endeavor 22 LLC, Trump Miami Resort Management LLC, Trump Miami Resort Management Member Corp, DJT Holdings, LLC, DJT Holdings Managing Member LLC, Donald J. Trump, The Donald J. Trump Revocable Trust dated April 7, 2014, The Trump Corporation, The Trump Organization, and each of their respective trustees, directors, managers, officers, employees, servants, agents, and representatives, and any and all related companies. Policies (other than WC and EPL) apply on primary non-contributory basis irrespective of any other insurance whether collectible or not. Insurer shall provide thirty (30) days advance written notice of cancellation, non-renewal or coverage reduction to additional insureds. Cont. on Acord 101 attached.

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| Trump Endeavor 12 LLC d/b/a Trump National Doral<br>4400 N.W. 87th Avenue<br>Miami, Florida 33178 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS.<br><br>AUTHORIZED REPRESENTATIVE |

ACORD 25 (2010/05)

© 1988-2010 ACORD CORPORATION. All rights reserved.
The ACORD name and logo are registered marks of ACORD

# Annex B

## Total Services Fee Breakdown

| | Service | Amount | Billing Frequency | Billing Date |
|---|---|---|---|---|
| 1. | 'Dedicated Environment Platform Licence' *(see Clause 1.1 of Part 3)* | $50,400.00 | Annual | 2025 Season: within 7 Business Days of the Commencement Date; and<br><br>2026 Season: within 7 Business Days of the Anniversary Date. |
| 2. | 'Supplier API Licence' *(see Clause 1.2.2 of Part 3)* | $65,000.00 | Annual | 2025 Season: within 7 Business Days of the Commencement Date; and<br><br>2026 Season: within 7 Business Days of the Anniversary Date. |
| 3. | 'Microblock Consumption' & Streaming Services *(as detailed at Clause 2 of Part 3).* | On actual usage, as calculated in accordance with Annex C* | Monthly in arrears. | Billed on the 1st day of the following month. |

| | | | | |
|---|---|---|---|---|
| 4. | 'Data Engine Licence'<br>*(see Clause 3.3 of Part 3)* | $180,000.00 | Annual | 2025 Season: within 7 Business Days of the Commencement Date; and<br><br>2026 Season: within 7 Business Days of the Anniversary Date. |
| 5. | 'Dynamic Cloud Mixer Licence'<br>*(see Clause 4.3 of Part 3)* | $300,000.00 | Annual | 2025 Season: within 7 Business Days of the Commencement Date; and<br><br>2026 Season: within 7 Business Days of the Anniversary Date. |
| 6. | 'ShotVu Application Licence'<br>*(see Clause 5.3 of Part 3)* | $54,000.00, subject to Clause 5.4 of Part 3, | Annual | 2025 Season: within 7 Business Days of the Acceptance Date; and<br><br>2026 Season: within 7 Business Days of the date one (1) year from the date of the relevant Acceptance Date. |
| 7. | 'TeamVu Application' build, integration and customisation<br>*(see Clause 6.2 of Part 3)* | $24,000.00 | Once | Within 7 Business Days of the Acceptance Date. |

| | | | | |
|---|---|---|---|---|
| 8. | 'TeamVu Application Licence' *(see Clause 6.3 of Part 3)* | $28,000.00 | Annual | 2025 Season: within 7 Business Days of the Acceptance Date; and<br><br>2026 Season: within 7 Business Days of the date one (1) year from the date of the relevant Acceptance Date. |
| 9. | 'Rules Bunker Licence' *(see Clause 7.3 of Part 3)* | $14,000.00 | Annual | 2025 Season: within 7 Business Days of the Commencement Date; and<br><br>2026 Season: within 7 Business Days of the Anniversary Date. |
| 10. | 'Clip Replay Generator' build, integration and customisation *(see Clause 8.2 of Part 3)* | $48,000.00 | Once | Within 7 Business Days of the Acceptance Date. |
| 11. | 'Clip Replay Generator Licence' *(see Clause 8.3 of Part 3)* | $204,000.00 | Annual | 2025 Season: within 7 Business Days of the Acceptance Date; and<br><br>2026 Season: within 7 Business Days of the date one (1) year from the date of the relevant Acceptance Date. |

| | | | | |
|---|---|---|---|---|
| 12. | 'KlipVu Application' build, integration and customisation *(see Clause 9.2 of Part 3)* | $270,000.00 | Once | Within 7 Business Days of the Acceptance Date. |
| 13. | 'KlipVu Application Licence' *(see Clause 9.3 of Part 3)* | $295,000.00 | 2026 Season only.<br><br>(For the avoidance of doubt, the licence fee payable with respect to the KlipVu Application Licence for the 2025 Season is $0.00). | 2026 Season: within 7 Business Days of the Anniversary Date. |
| 14. | 'Kode Application' customisation to support AI Caddie *(see Clause 10.1 of Part 3)* | $180,000.00 | Once | Within 7 Business Days of the Acceptance Date. |
| 15. | 'Kode Licence' *(see Clause 10.3 of Part 3)* | $165,000.00 | Annual | 2025 Season: within 7 Business Days of the Acceptance Date; and<br><br>2026 Season: within 7 Business Days of the date one (1) year from the date of the relevant Acceptance Date. |

| | | | | | | |
|---|---|---|---|---|---|---|
| 16. | Support Service *(see Clause 9.3 of Part 3)* | (a) | Media Services Engine (Dedicated Platform) | $5,040.00 | Annual | 2025 Season: within 7 Business Days of the Commencement Date; and<br><br>2026 Season: within 7 Business Days of the Anniversary Date. |
| | | (b) | Supplier API | $6,500.00 | Annual | 2025 Season: within 7 Business Days of the Commencement Date; and<br><br>2026 Season: within 7 Business Days of the Anniversary Date. |
| | | (c) | Microblock Consumption - Streaming Services | 10% of amount payable for any Microblock consumption in respective month. | Monthly in arrears. | Billed on the 1st day of the following month |
| | | (d) | Data Engine | $18,000.00 | Annual | 2025 Season: within 7 Business Days of the Commencement Date; and,<br><br>2026 Season: within 7 Business Days of the Anniversary Date. |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | (e) | Dynamic Cloud Mixer + DCM API | $30,000.00 | Annual | 2025 Season: within 7 Business Days of the Commencement Date; and<br><br>2026 Season: within 7 Business Days of the Anniversary Date. |
| | | (f) | ShotVu Application | $5,400.00, subject to Clause 5.4 of Part 3, | Annual | 2025 Season: within 7 Business Days of the Acceptance Date; and<br><br>2026 Season: within 7 Business Days of the date one (1) year from the date of the relevant Acceptance Date. |
| | | (g) | Existing Product Support | $20,539.00 | Annual | 2025 Season: within 7 Business Days of the Commencement Date; and<br><br>2026 Season: within 7 Business Days of the Anniversary Date. |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | (h) | New Product Support | $25,780.00 | Annual | 2025 Season: within 7 Business Days of the Commencement Date; and<br><br>2026 Season: within 7 Business Days of the Anniversary Date. |
| | | (i) | TeamVu Application | $2,800.00 | Annual | 2025 Season: within 7 Business Days of the Acceptance Date; and<br><br>2026 Season: within 7 Business Days of the date one (1) year from the date of the relevant Acceptance Date. |
| | | (j) | Rules Bunker Application | $1,400.00 | Annual | 2025 Season: within 7 Business Days of the Commencement Date; and<br><br>2026 Season: within 7 Business Days of the Anniversary Date. |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | (k) | Clip Replay Generator | $20,400.00 | Annual | 2025 Season: within 7 Business Days of the Acceptance Date; and<br><br>2026 Season: within 7 Business Days of the date one (1) year from the date of the relevant Acceptance Date. |
| | | (l) | KlipVu Application | $29,500.00 | 2026 Season only.<br><br>(For the avoidance of doubt, the amount payable for this Support Service for the 2025 Season shall be $0.00). | 2026 Season: within 7 Business Days of the date one (1) year from the date of the relevant Acceptance Date. |
| | | (m) | Kode Platform for AI Caddie | $16,500.00 | Annual | 2025 Season: within 7 Business Days of the Acceptance Date; and<br><br>2026 Season: within 7 Business Days of the date one (1) year from the date of the relevant Acceptance Date. |

| | | | | |
|---|---|---|---|---|
| 17. | KAM - travel, meals and accommodation | Amounts incurred, subject to Clause 14.6 of Part 4.<br><br>n.b. accommodation to be booked directly by LIV Golf Parties. | Monthly in arrears | Billed on the 1st day of the following month |

* With respect to each Season during the Term, the Parties forecast that the amounts payable by the LIV Golf Parties in respect of 'Microblock Consumption' shall not be in excess of $347,585.70 or such other figure with respect to the 2026 Season as the Parties may agree from time-to-time, and, accordingly, any amounts in respect of the 'Support Service' Fee detailed at row 16(c) of this Annex B are not forecast to exceed $34,758.57 in 2025, and the Parties shall monitor the actual Microblock Consumption and Support Service Fee detailed at row 14(b) of this Annex B against the forecasted amounts regularly throughout each Season. To the extent that at any point during each Season during the Term, the Supplier forecasts that the amounts payable with respect to 'Microblock Consumption' will exceed such amount, the Supplier shall promptly notify the LIV Golf Parties of the same. Notwithstanding this, the Parties acknowledge and agree that in no event shall the actual Microblock Consumption and Support Services Fees exceeding the forecasted amounts payable result in the Services or the payment of the Services Fees being suspended in any manner whatsoever.

## Annex C

## Streaming Services Fee Breakdown

Set out below is streaming pricing applicable for the 2025 and 2026 Seasons for the private Black Box which is available in four tiers (Standard, Business, Enterprise, Enterprise Premium).

The Enterprise pricing tier shall apply, unless the respective spend threshold for Enterprise Premium is reached as outlined in the 'Streaming Pricing - private Black Box' table set out below.

The requirements for global real-time video delivery will determine the number of global Edge Clusters required.

The pricing calculations are outlined in the Streaming Assumptions and Pricing tables below, specifically adaptive bitrate ("**ABR**") as set out below but which may be modified by a LIV Golf Party, global Edge Cluster usage, and Microblock distribution.

**'Streaming Pricing - private Black Box'**

| Pricing Tier | Annual Spend | Microblock Consumption per GB per Cluster |
|---|---|---|
| **Enterprise** | $0 - $499,999 | $0.47 / GB |
| **Enterprise Premium** | more than $500,000 | $0.44 / GB |

**Streaming Assumptions & Pricing**

The ABR ladder shall be adjusted by the Supplier to support any specification as notified by a LIV Golf Party to Supplier. Fees are based on data distribution across global Edge Clusters. 12 global Edge Clusters are required to support global synchronization and real time video delivery. Video distribution is to ViewLift and SimpleBet players only for LIVGolf+.

**Adaptive Bitrate (subject to final modification by a LIV Golf Party)**

| Resolution | Bitrate | GB / Hour |
|---|---|---|
| 1080P | 5.8 Mbps | 2.61 |
| 720P | 3.5 Mbps | 1.575 |
| 480P | 1.5 Mbps | 0.675 |
| 360P | 600 Kbps | 0.27 |
| Audio | 128 Kbps | 0.0576 |
| | **Total** | **5.1876 GB / Hour** |

**Global Edge Cluster Usage**

| | Cost per GB | Total per hour | Notes |
|---|---|---|---|
| Microblock Consumption per Edge Cluster | $0.47 / GB | $2.438172 | 5.1876 GB x $0.47. |
| Total per Edge Cluster | | **$2.438172** | **Cost per hour streaming per stream** |

**Microblock distribution with 12 Global Edge Clusters and based on assumptions set out in below table**

| | Amount | Costs | Notes |
|---|---|---|---|
| Global Edge Clusters | 12 | $29.25 per hour | 12 Edge Clusters for Global Real-Time Latency & Sync |
| Streaming hours per day | 8 | $234.06 per day | 3 hours prior to Live + 5 hours live |
| Number of Streams per day | 33 | $7,724.12 per day | 32 camera hole feeds + 1 additional |
| Event Cost – Enterprise Pricing Tier | | $23,172.38 | 3 Streaming days per Event |

**Pricing Tiers & Discounts**

| Event Cost Pricing Tier | Global Region |
|---|---|
| Enterprise | $23,172.38 |

| Number of Events | Pricing Tier | Per Event Cost | Projected Annual Spend |
|---|---|---|---|
| 15 | Enterprise | $23,172.38 | $347,585.70 |

## Annex D

## Service Levels and Service Credits

**1. Service Levels**

**Support Services**

1.1. Any Support Services will be classified in one of the following four severity levels, based on the respective definitions hereunder agreed to. The response time for each severity level is defined as follows:

| Severity | Response Time Targets | Resolution Targets | Service Credits – consequence of failure to adhere to Response Time Target or Resolution Target |
|---|---|---|---|
| ***Level 1*** *Urgent* *Full Production Outage Issues* | 15 min | Within 1 Hour | 15% of the Fees payable by the LIV Golf Parties in an Event Day (set out in Annex C)* |
| **Level 2** Critical Critical Production Impacting Issues | 15 min | Within 2 Hours | 12.5% of the Fees payable by the LIV Golf Parties in an Event Day (set out in Annex C) * |
| **Level 3** Major Significant business impact, with little to no production impact | 15 min | Within 3 Hours | 10% of the Fees payable by the LIV Golf Parties in an Event Day (set out in Annex C) * |
| **Level 4** Normal Moderate to minor business impact, and non-workflow impacting issues | 12 Hours | Within 1 Business Day | 5% of the Fees payable by the LIV Golf Parties in an Event Day (set out in Annex C) * |
| * For the purposes of this calculation, Fees payable by the LIV Golf Parties in an Event Day are deemed to be: $14,911.05. | | | |

1.2. Further details on the Service Levels regarding the Support Services are as follows:

1.2.1. SERVICE LEVEL 1: URGENT - EMERGENCY ISSUE - PRODUCTION BLOCKING: The Product(s) or Service(s) is inoperative, or performance is so downgraded that normal operations are prevented almost entirely. Examples of production blocking issues include the cessation of operation of one or more of the Supplier's solutions or services, which could not be resolved by switching to redundant resources.

1.2.2. SERVICE LEVEL 2: CRITICAL ISSUE: The performance of the Product(s) or Service(s) is far below the documented performance criteria, such that a disruption to normal business operations is occurring or the problem is threatening to cause a production blocking Issue. Examples of critical Service Level Failures include severe degradation in system performance or a significant reduction in video output quality.

1.2.3. SERVICE LEVEL 3: MAJOR ISSUE: The Product(s) or Service(s) is experiencing errors or problems that do not impact normal production operations but may otherwise have a significant impact on other business operations. An example of a Major Issue is where a redundant power supply in a non-redundant production product has failed but the second power supply is still actively running the hardware and production services are not threatened.

1.2.4. SERVICE LEVEL 4: NORMAL ISSUE: The Product(s) or Service(s) is experiencing an issue that does not impact normal operations or is easily avoided or circumvented by the LIV Golf Parties. This includes documentation errors, requests for clarification of product features, requests for new features (which are defined as new functionality in existing product), general system maintenance issues, or issues that can be resolved with configuration changes available in the Supplier's solution.

1.3. Response time measurements begin at the time an incident is first reported to the Supplier's KAM or remote support team. Severity Level 1, Level 2, Level 3 and Level 4 incidents must be reported in-person to the KAM, or via Telephone or Email or Instant Messaging Platform (example: Slack) to either the KAM or remote support team.

1.4. The Supplier shall use all commercially reasonable efforts to resolve Severity Level 1 incidents as quickly as possible. Resolution of incidents classified at other Severity Levels shall be prioritized across all LIV Golf Parties' reported incidents, based on defined resolution targets.

1.5. Resolution is defined as a permanent correction of an issue. The Supplier shall make all reasonable efforts to provide permanent software updates for defects previously identified as resulting in Severity 1 or Severity 2 incidents, though specific targets are not guaranteed.

**Uptime**

1.6. During the broadcast of any Event for which the Supplier is providing Streaming Services under this Agreement, the Supplier guarantees that the Streaming Services will maintain a level of uptime equal to or better than 99.9% (the "**Uptime Percentage**"), excluding downtime resulting from circumstances beyond the reasonable control of the Supplier, including without limitation (a) issues solely associated with third party solutions or services such as those provided by ViewLift or the GCP; (b) failure by the LIV Golf Parties to provide sufficient bandwidth for the Streaming Services; and (c) Force Majeure Events. The Uptime Percentage for the Streaming Services will be calculated by the following formula: total duration of the Event's broadcast in minutes, minus downtime, times 100, divided by the total duration of the Event's broadcast in minutes.

| **Uptime Percentage in relation to an Event** | **Service Credit**<br><br>**(as a percentage of the Fees payable in relation to an Event)*** |
|---|---|
| 99.9% or above | No Service Credits due |
| Between 99.9-99.5% | 5% |
| Between 99.4-99.0% | 10% |

| | |
|---|---|
| Between 98.9-98.0% | 15% |
| Between 97.9-95.0% | 20% |
| Between 94.9-90.0% | 35% |
| Between 89.9-75.0% | 50% |
| Between 74.9-50.0% | 65% |
| Below 50.0% | 100% |
| * For the purposes of this calculation, Fees payable by the LIV Golf Parties in relation to an Event are deemed to be: $44,733.14. | |

**2. Service Credits**

2.1. A failure to provide the Support Services in accordance with the Service Levels as described at paragraph 1.1 of this Annex D shall result in a Service Credit being payable by Supplier to the LIV Golf Parties, calculated in accordance with paragraph 1.1 of this Annex D.

2.2. A failure to provide the Streaming Services which meet the Uptime Percentage in relation to any Event, shall result in a Service Credit being payable by Supplier to the LIV Golf Parties, calculated in accordance with paragraph 1.6 of this Annex D. For greater certainty, if there is a failure by the Supplier to meet the Uptime Percentage and the Supplier meets the Response Time Target and Resolution Target specified in paragraph 1.1 of this Annex D, the LIV Golf Parties shall still be entitled to receive a Service Credit in relation to the failure meet the Uptime Percentage.

2.3. Where a Service Credit is payable in respect of a Service Level Failure it shall be paid by the Supplier to the LIV Golf Parties in the form of a credit note by the end of the month in which the Service Credit is incurred (or if no further Fees are due to the Supplier, as a debt payable to the LIV Golf Parties immediately on incurring the Service Credit).

**3. Measurement and Reporting Requirements**

3.1. The Supplier shall, within 5 days following the end of each Measurement Period, submit to the LIV Golf Parties a comprehensive written report (a "**Performance Monitoring Report**") detailing:

3.1.1. the performance of the Services against the Service Levels in (i) the relevant Measurement Period, (ii) the 3-month period up to the end of the relevant Measurement Period and (iii) the 12-month period up to the end of the relevant Measurement Period;

3.1.2. any Service Level Failures in the relevant Measurement Period, the causes of such Service Level Failures and the steps taken by the Supplier to mitigate the effects and prevent the recurrence of such Service Level Failures; and

3.1.3. any other matters agreed between the Parties.

3.2. The Parties shall attend performance review meetings ("**Performance Review Meetings**") as and when required by the LIV Golf Parties. The Performance Review Meetings shall be the forum for the review by the Supplier and LIV Golf Parties of the Performance Monitoring Reports. The Performance Review Meetings shall (unless otherwise agreed) take place at such location and time as the LIV Golf Parties shall reasonably require unless otherwise agreed in advance.

3.3. The Supplier shall provide to the LIV Golf Parties Performance Monitoring Reports and any other supporting documentation as the LIV Golf Parties may reasonably require in order to verify the

level of the performance by the Supplier.

**4. Consequence of a Service Level Failure**

4.1. In the event of a Service Level Failure, the Supplier shall, at its own cost and without prejudice to the LIV Golf Parties' other rights or remedies, promptly:

4.1.1. notify the LIV Golf Parties of the Service Level Failure;

4.1.2. investigate the underlying causes of the Service Level Failure;

4.1.3. report the findings of such investigation to the LIV Golf Parties and set out the steps the Supplier intends to take in order to mitigate the effects of the Service Level Failure and prevent it from recurring;

4.1.4. take whatever action is necessary to minimise the impact of the Service Level Failure and to prevent it from recurring;

4.1.5. correct the Service Level Failure and resume the provision of the Services to the standard required to achieve the relevant Service Level;

4.1.6. advise the LIV Golf Parties of the status of remedial efforts being undertaken with respect to the underlying cause of the Service Level Failure; and

4.1.7. where a Service Credit is payable in respect of the Service Level Failure it shall be paid by the Supplier to the LIV Golf Parties in accordance with Paragraph 2 of this Annex D.

**5. Records**

5.1. Throughout the duration of this Agreement and for a period of 2 years thereafter the Supplier shall keep appropriate documents and records relating to this Agreement (the "**Performance Records**") including:

5.1.1. records of Service Level Failures;

5.1.2. Performance Monitoring Reports;

5.1.3. any documents related or ancillary to the above including all metrics and underlying data used to compile the reports and records; and

5.1.4. such other supporting documentation as the LIV Golf Parties may reasonably require in order to verify the level of the performance of the Supplier.

5.2. The Performance Records shall be available for inspection by the LIV Golf Parties and/or its nominee at any time and the LIV Golf Parties and/or its nominee may make copies of any such records and documents.

**6. Effect of a LIV Golf Party's Failure or Delay**

6.1. The Supplier is not responsible or liable for any delay or failure of performance to the extent it is caused directly by (a) any delay or failure of the LIV Golf Parties to perform any of the LIV Golf Parties' obligations under the Agreement, including this Annex D, or (b) any critical errors in, or material disruption to, a LIV Golf Party's systems, data, or other content or third-party services used and caused directly by the LIV Golf Parties, except in the event that any such

critical errors or material disruptions are caused wholly or in part by the Supplier or any of its authorised persons.

**7. LIV Golf Parties' Obligations**

7.1. The LIV Golf Parties shall promptly notify the Supplier of any malfunction or error in the operation of the Services or the Product(s) that becomes known to the LIV Golf Parties and provide the Supplier with reasonable detail of the nature and circumstances of such error.

7.2. In connection with the performance of the Services, the LIV Golf Parties shall provide the Supplier Personnel with all such cooperation and assistance as they may reasonably request, or otherwise may reasonably be required, to enable the Supplier to perform its obligations (including the provision of the Services), and exercise its rights, under and in accordance with the terms and conditions of this Agreement, including:

7.2.1. reasonable, uninterrupted access, both physical and virtual, to the LIV Golf Parties' premises, systems, networks, computers, and facilities;

7.2.2. a safe working environment;

7.2.3. reasonable access to the appropriate LIV Golf Parties' personnel, including network, systems, computers, operations, and applications personnel; and

7.2.4. all necessary authorizations and consents, whether from third parties or otherwise, in connection with any of the foregoing.

## Annex E

## PRODUCTS, PRODUCT SPECIFICATIONS AND DELIVERY

1. **PRODUCTS:**

**Encoders**: 8 x Mobii Apex Encoder - M2103S2 (with specification as per 2. below)

**Shock Mount Rack Cases:**

- 3 x 12RU, 20" Deep Shock mount Rack Case with Wheels 3SKB-R12U20W
- Integrate Quantity (2 or 3) Mobii Apex encoders (M2103S2) Airflow front to rear front and rear side 4 point mounting
- (2 or 3) sets of SFP+SR, RJ45, USB, HDM rear I-O panel with silk screening top rack with internal cabling and strain relief routing to not impede airflow
- (2 or 3) sets of 12 x SDI I-O terminated to rear I-O patch panel with silk-screening top of rack with internal cabling, strain relief routing to not impede airflow
- Bottom routing of A and B Power Supply cabling to rear bottom mount A & B PDU routing to not impede airflow and with retention connections
- Front and Rear lids removable for operation

**1x Hard Travel Case**

2. **PRODUCT SPECIFICATION OF ENCODERS:**

| | |
|---|---|
| **Physical** | |
| Dimensions | 16.5 (H) x 41.5 (W) x 40.5 (D) –cm<br>6.5 (H) x 16.3 (W) x 15.9 (D) - in |
| Weight | 9kg |
| **Electrical** | |
| Max potential power | 900W 1+1 hot swop |
| AC Power | 100 – 240 VAC (Input Voltage) |
| Line Frequency | 50 – 60 Hz |
| **Environmental** | 10 to 35 degrees °C (50 to 95 °F) |

| | |
|---|---|
| Operational conditions<br><br>Storage conditions<br><br>Noise level<br><br>Heat dissipation | -40 to 60 degrees °C (-40 to 140 °F)<br><br>63 dBA (Max)<br><br>2400 BTU/hr (Max) |
| **System**<br><br>Onboard storage | 1TB NVMe + 8TB NVMe |
| **Input Sources**<br><br>Standard | SDI (3G, 6G, 12G) |

**Model configuration:**

| Series | Model | SDI (Bi-Directional) | Network I/O | Max Transcode Pixel Density | Other (configuration changes) |
|---|---|---|---|---|---|
| S2 | M2103S2 | X12 (3G / 6G / 12G) | 2 x 1GbE & 1 x 10Gbps (Fiber) | 3440 Mpx/s (3.44Gpx/s) | - 2 x RTXA4000 SFF ADA Single Slot Nvidia GPU's |

3. **EXISITNG PRODUCTS UPGRADE**

**Encoder Upgrade to Existing Units (M2102S2)**

**Product:** Mobii Apex Encoder upgrade from M2102S2 to M2103S2 as defined by upgrade components table below.

**Encoder Serial Numbers:** NSX34360091, NSX34360106, NSX34360107, NSX34360108, NSX34360109, NSX34360110

**Upgrade Components**
RTXA4000 SFF ADA Single Slot Nvidia GPU per encoder x6
SDI capture cards supporting additional 4 x SDI Feeds per encoder x6
1+1 hot swap 900W PSU and PSU kit per encoder x6
Reassembly/Retesting/Reimaging/test per encoder x6

4. **DELIVERY DETAILS:**

4.1. Delivery Location:

4.1.1. Products and Existing Product upgrades are to be delivered to an address to be notified by LIV US to the Supplier (subject to paragraph 4.1.2 below).

4.1.2. LIV US acknowledges that if it requires delivery outside of the United States of America that additional delivery charges may apply. In such instance, Supplier shall use best endeavours to minimise such additional charges (with it being acknowledged that the Purchase Amount includes an amount for delivery within the United States, and any additional charges shall factor in such existing payment) and a LIV Golf Party shall not be responsible for such charges unless it has agreed to such additional charges in writing.

4.2. Delivery Date: To the extent not delivered prior to the Commencement Date, Products and Existing Product upgrades are to be delivered or ready for delivery (as notified by the LIV Golf Parties to the Supplier) by the Supplier within earlier of: (i) 5 days of the Commencement Date or (ii) 1 January 2025.

## Annex F

## PRODUCT PRICES

### 1. Encoder Upgrade to Existing Units (M2102S2)

**Product:** Mobii Apex Encoder upgrade from M2102S2 to M2103S2 as defined by upgrade components table below.

**Total Upgrade Price:** $40,488.00

**Encoder Serial Numbers:** NSX34360091, NSX34360106, NSX34360107, NSX34360108, NSX34360109, NSX34360110

**Upgrade Components Table:**

| Upgrade Configuration | Unit Cost | Total Units | Total Upgrade cost |
|---|---|---|---|
| 1 x RTXA4000 SFF ADA Single Slot Nvidia GPU per encoder | $2,877.00 | 6 | $17,262.00 |
| 1x SDI capture cards supporting additional 4 x SDI Feeds per encoder | $950.00 | 6 | $5,700.00 |
| 1+1 hot swap 900W PSU and PSU kit per encoder | $1,646.00 | 6 | $9,876.00 |
| Reassembly/Retesting/Reimaging/test per encoder | $1,275.00 | 6 | $7,650.00 |

### 2. Encoders

**Product:** Mobii Apex Encoder – M2103S2 with all features set out in Annex E of this Agreement.

**Product list price:** $46,035.00 (before discount)

**Discount applied by Supplier**: 20%

**Final price per Product:** $36,828.00

**Volume of Products**: 7

**Total Purchase Amount payable by the LIV Golf Parties in relation to the Encoders (as described at Annex E):** $257,796.00

### 3. New Encoder for Redundancy (M2103S2)

**Product:** Mobii Apex Encoder – M2103S2 with all features set out in Annex E of this Agreement.

**Product list price:** $46,035.00 (before discount)

**Discount applied by Supplier**: 99.998%

**Final price per Product:** $1.00

**Volume of Products:** 1

**Total Purchase Amount payable by the LIV Golf Parties in relation to the Encoders (as described at Annex E):** $1.00

**4. Shock Mount Rack Cases**

**Product:** Shock Mount Rack Cases with all features set out in Annex E of this Agreement

**Product Price:** $0.00

**Volume of Products:** 3

**Total Purchase Amount payable by LIV Golf in relation to the Shock Mount Rack Cases (as described at Annex E):** $0.00

**5. Hard Travel Cases**

**Product:** Hard Travel Case

**Product Price:** $1,699.00

**Volume of Products:** 1

**Total Purchase Amount payable by LIV Golf in relation to the Hard Travel Cases (as described at Annex E):** $1,699.00

**Annex G**

**C-to-P Transfer Clauses**

**Standard Contractual Clauses**

The Terms of the EU Standard Contractual Clauses set out in the Annex of Commission Implementing Decision (EU) 2021/914 of 4 June 2021 (found here: https://commission.europa.eu/publications/standard-contractual-Clauses-international-transfers_en) shall be incorporated into the Agreement as follows:

1. The Module applicable to the transfer of personal data originating from an EEA entity under the Agreement is Module 2 "Controller to Processor".

2. The following selections are made, where Commission Implementing Decision (EU) 2021/914 permits selection of options in the Clauses of the C-to-P Transfer Clauses:

   a. Clause 7 "Optional (Docking Clause)" – not retained.

   b. Clause 9 "Sub-processors" – option 1 in this sub-section is selected.

   c. Clause 11 "Redress" – sub section (a) – the option provided in this sub-section is not selected.

   d. Clause 17 "Governing Law" – option 1 is selected and the governing law is as follows:

   "*These Clauses shall be governed by the law of one of the EU Member States, provided such law allows for third-party beneficiary rights. The Parties agree that this shall be the law of the Republic of Ireland*."

   e. Clause 18 "Choice of Forum and Jurisdiction" sub-section (b) is amended as follows:

   "*The Parties agree that those shall be the courts of Dublin, Ireland*."

   f. Annex IA to the C-to-P Transfer Clauses shall be considered filled as follows:

      i. the Data Exporter is LIV UK and LIV US and the Exporter's details are the same as LIV UK and LIV US's details as set out in this Agreement; and

      ii. the Data Importer is the Supplier and the Importer's details are the same as the Supplier's details as set out in the Agreement.

   g. Annex IB to the C-to-P Transfer Clauses shall be completed as set out at Clause 25.4.1.

   h. Annex IC is completed as follows: The Irish Data Protection Commission in the European Economic Area and the Information Commissioner's Office in the UK.

   i. Annex II to the C-to-P Transfer Clauses shall be as follows:

   **Mobii Security Measures**

      1. **Encryption:**
         a. All data transmitted to and from Mobii's systems is encrypted using industry-standard encryption protocols.
         b. Stored data, including video content, is encrypted to protect against unauthorized access.

c. **DRM Encryption for Video Content:** Utilizing ViewLift's DRM (Digital Rights Management) encryption technology, with DRM keys provided by Axinom, to secure access to video content. This implementation ensures that video data is only accessible by authorized users, preventing unauthorized copying and distribution.

2. **Integrity, Availability, and Resilience of Systems:**
   a. Regular updates to ensure ongoing integrity and security.
   b. Redundant systems and backups in place to maintain availability and resilience in case of system failures.

3. **Testing and Processing:**
   a. Regular security assessments and penetration testing to identify and mitigate potential vulnerabilities.
   b. Continuous monitoring for security threats and anomalies in system processing.

4. **User Identification and Authorization:**
   a. Strong authentication measures, including multi-factor authentication for user access.
   b. Role-based access control to ensure users have appropriate access levels.

5. **Data Protection during Transmission and Storage:**
   a. Secure protocols (such as SSL/TLS) used for data transmission.

6. **Compliance with Relevant Laws and Regulations:**
   a. Regular reviews to ensure compliance with data protection laws and industry regulations.

j. Annex III to the C-to-P Transfer Clauses is completed as follows:

There are no sub-processors engaged by the Data Importer.

## Annex H

## UK International Data Transfer Addendum

The terms of the International Data Transfer Addendum to the EU Commission Standard Contractual Clauses as issued by the Information Commissioner's Office and laid before UK parliament in accordance with section 119A of the Data Protection Act 2018 on 2 February 2022, as it is revised under Section 18 ("**Approved EU SCCs**"), shall be incorporated into the Agreement (as found here: https://ico.org.uk/media/for-organisations/documents/4019539/international-data-transfer-addendum.pdf) including to the extent modified in this Schedule.

For the purpose of this Annex H only, a reference herein to this "Addendum" shall have application only to this Annex H.

**Table 1: Parties**

| **The Parties** | **Exporter (who sends the Restricted Transfer)** | **Importer (who receives the Restricted Transfer)** |
|---|---|---|
| **Parties' details** | Full legal name: LIV UK and LIV US. | Full legal name: the Supplier. |
| | Trading name (if different): | Trading name (if different): |
| | Main address (if a company registered address): the same as set out for the Parties in the Agreement. | Main address (if a company registered address): the same as set out for the Parties in the Agreement. |
| | Official registration number (if any) (company number or similar identifier): the same as set out for the Parties in the Agreement. | Official registration number (if any) (company number or similar identifier): the same as set out for the Parties in the Agreement. |
| **Key contacts** | Full name (optional): Louise Savage | Full name (optional): Greg Schultz |
| | Job title: General Counsel | Job title: CEO |
| | Contact details including email: louise.savage@livgolf.com | Contact details including email: greg@mobii.com |
| **Signature (if required for the purposes of Section 2)** | Acknowledged by the signing of this Agreement. | Acknowledged by the signing of this Agreement. |

**Table 2: Selected SCCs, Modules and Selected Clauses**

<table>
<tr><td colspan="2">Addendum EU SCCs</td><td colspan="5">The version of the Approved C-P Transfer Clauses shall apply as applicable to the transfer of personal data as set out in Annex G respectively, including the Appendix Information.<br><br>Date: Not applicable<br><br>Reference (if any): Not applicable<br><br>Other identifier (if any): Not applicable</td></tr>
<tr><td>Module</td><td>Module in operation</td><td>Clause 7 (Docking Clause)</td><td>Clause 11 (Option)</td><td>Clause 9a (Prior Authorisation or General Authorisation)</td><td>Clause 9a (Time period)</td><td>Is personal data received from the Importer combined with personal data collected by the Exporter?</td></tr>
<tr><td>1</td><td></td><td></td><td></td><td>-</td><td>-</td><td>-</td></tr>
<tr><td>2</td><td>x</td><td>x</td><td>x</td><td>Prior Authorisation</td><td>30 days</td><td>No</td></tr>
<tr><td>3</td><td></td><td></td><td></td><td></td><td></td><td>-</td></tr>
<tr><td>4</td><td></td><td></td><td></td><td>-</td><td>-</td><td></td></tr>
</table>

**Table 3: Appendix Information**

"Appendix Information" means the information which must be provided for the selected modules as set out in the Appendix of the Approved EU SCCs (other than the Parties), and which for this Addendum is set out in:

| |
|---|
| Annex 1A: List of Parties:<br>- The Data Exporter is LIV UK and LIV US (as applicable) set out in the Agreement and the Exporter's details are the same as set out in this Agreement.<br>- The Data Importer is the Parties (as applicable) set out in this Agreement and the Importer's details are the same as set out in this Agreement. |
| Annex 1B: Description of Transfer: shall be the same as Clause 16.4 of Part 4 of this Agreement. |

| |
|---|
| Annex II: Technical and organisational measures including technical and organisational measures to ensure the security of the data: shall be the same as paragraph 2(i) of Annex G of this Agreement. |
| Annex III: List of Sub processors (Modules 2 and 3 only): shall be the same as Annex G of this Agreement. |

**Table 4: Ending this Addendum when the Approved Addendum changes**

| | |
|---|---|
| Ending this Addendum when the Approved Addendum changes | Which Parties may end this Addendum as set out in Section 19:<br>£ Importer<br>S Exporter<br>£ Neither Party |